# EXHIBIT 1

9/27/2016 3:07:59 PM
Chris Daniel - District Clerk Harris County
Envelope No. 12929766
By: Charlie Tezeno
Filed: 9/27/2016 3:07:59 PM

CAUSE NO. _____

| | | |
|---|---|---|
| KF FRANCHISING, LTD., | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TASONE INC., STEVE BOLES, AND | § | |
| RAZIJE ELEZ, | § | |
| | § | |
| *Defendants*. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S VERIFIED ORIGINAL PETITION AND APPLICATION FOR PERMANENT INJUNCTION

Plaintiff KF Franchising, Ltd. ("KFF" or "Plaintiff") files this Verified Original Petition and Application for Permanent Injunction against TASONE inc. ("Tasone"), Steve Boles ("Boles") and Razije Elez ("Elez") (collectively, "Defendants").

### I.
### DISCOVERY CONTROL PLAN

Any discovery in this matter will be conducted under Texas Rule of Civil Procedure 190.4 (Level 3).

### II.
### RULE 47 STATEMENT

KFF seeks monetary relief over $200,000 but not more than $1,000,000.

### III.
### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff KF Franchising, Ltd. is a Texas limited partnership with its principal place of business located at 23240 Westheimer Parkway, Suite A, Katy, Texas 77494.

2.      Defendant TASONE inc. is a Colorado corporation with its principal place of business located at 6633 Welch Street, Arvada, Colorado 80004.  TASONE inc. is formerly

known as Tasone LLC.  Tasone may be served through its registered agent, Razije Elez, at 6633 Welch Street, Arvada, Colorado 80004.

3.     Defendant Steve Boles is an individual who is believed to be residing in Jefferson County, Colorado.  Defendant Steve Boles may be served with process at 6633 Welch Street, Arvada, Colorado 80004.

4.     Defendant Razije Elez is an individual who is believed to be residing in Jefferson County, Colorado.  Defendant Razije Elez may be served with process at 6633 Welch Street, Arvada, Colorado 80004.

5.     This Court has jurisdiction over this case because Plaintiff seeks legal and equitable relief within this Court's jurisdiction, the amount in controversy exceeds the jurisdictional limits of this Court, and the parties agreed to submit to the jurisdiction of any federal or state district court in Harris County, Texas pursuant to the Franchise Agreement and the Guaranty.

6.     Venue is proper in this Court pursuant to Texas Civil Practice and Remedies Code § 15.035 because Tasone agreed to venue in Harris County,  and Boles and Elez contracted in writing to perform obligations in Harris County, Texas as set forth in the Guaranty.

## IV.
## FACTUAL BACKGROUND

*KF Franchising, Ltd.'s Business*

7.     KFF is a limited partnership that was formed on November 29, 2000.  Its sole general partner is Kolache Factory Management, L.L.C., a Texas limited liability company. Kolache Factory, Inc. is an affiliated company that developed the Kolache Factory business system in 1981 and opened the first Kolache Factory bakery in March 1982.

8.     Kolache Factory, Inc. currently operates 23 Stores of its own.  It began offering franchises in 1997 and had sold franchises for five Stores by the time KFF was organized. Kolache Factory, Inc.'s principal office address is the same as KFF, and KFF has no other parents, predecessors or other affiliates.

9.     KFF's only business is the sale and servicing of Kolache Factory franchises. Kolache Factory bakery cafes ("Stores") are distinctive retail outlets that operate under the Kolache Factory trade name.  They sell KFF's proprietary brand of kolaches, which they make fresh daily from KFF's propriety dough and from various fillings, including meat, cheese and fruit.  Stores may also serve coffee, soft drinks, chips and other snack foods.  A Kolache Factory franchise entitles a franchisee to operate one Store at an approved location.  The Franchisee must operate the Store under the business system and operating procedures KFF developed, as described in the Operations Manual.  Franchisees must use the propriety brand of kolache dough in all of the franchisee's kolaches, and franchisees must follow the propriety recipes in making the kolaches.  Franchisees may only sell the menu items that KFF specifies or approves.

10.     Stores are designed to be located in shopping centers, malls and free standing buildings.  They typically occupy from 1,800 to 2,000 or more square feet of leased retail space. Smaller footprint stores generally provide limited customer seating and are designed for customers who purchase KFF's products for off-premises consumption.  KFF also encourages its franchisees to offer catering services for parties, school functions, fairs and similar events.

11.     Kolaches appeal primarily to adult consumers, ages 25 to 49.  Many of KFF's customers consider kolaches breakfast food, and approximately 80% of a typical Store's sales occur between the hours of 6:00 and 10:00 in the morning.  Stores compete with quick service restaurants and convenience stores that sell carry-out breakfast sandwiches and pastries and, to a

**PLAINTIFF'S VERIFIED ORIGINAL PETITION AND**
<u>**APPLICATION FOR PERMANENT INJUNCTION**</u>                                    PAGE 3

lesser degree, with donut shops.   A Store's sales do not experience significant seasonal fluctuations.

**The Franchise Agreement and Guaranty**

12.     In January 2015, KFF entered into a Franchise Agreement with Tasone LLC.   A true and correct copy of the Franchise Agreement is attached hereto as Exhibit "A."   The term of the Franchise Agreement is ten years, unless sooner terminated.  (Ex. A, § 11).

13.     Boles and Elez also executed a Guaranty and Acknowledgment ("Guaranty") in which they jointly and severally, absolutely and unconditionally guaranteed to KFF (i) the faithful and punctual performance of each and every duty and obligation of Tasone under the Franchise Agreement, and (ii) the payment in full of certain monetary obligations when they came due.   A true and correct copy of the Guaranty is attached hereto as Exhibit "B."

14.     On August 17, 2015, KFF and Tasone LLC executed a Change of Name/Entity Form Amendment to Franchise Agreement (the "Amendment") to reflect the fact that: (i) Tasone LLC changed its name and entity form to TASONE inc., a Colorado corporation; and (ii) Elez had transferred all of her interests in Tasone LLC/TASONE inc. to Boles.  Boles also confirmed in the Amendment that the name change and entity form change had no effect on the scope, validity or enforceability of his guaranty of Tasone's obligations to KFF under the Franchise Agreement.

15.     KFF and Tasone agreed in the Franchise Agreement that Tasone would be subject to requirements and obligations in connection with the construction and operations of the Store.  (Ex. A, § 7(d)).  Tasone agreed it would be in default of the Franchise Agreement if, among other things, it failed correct any noncompliance within 30 days after KFF notified Tasone in writing that it had failed to fulfill a requirement or perform an obligation.  (Ex. A, § 16).

16.   KFF and Tasone further agreed that Tasone would be subject to certain use and disclosure requirements related to KFF's intellectual property, including KFF's Marks, Copyrighted Materials, and Trade Secrets.   (Ex. A, § 12).   KFF and Tasone agreed to the definitions of those terms as defined in the Franchise Agreement as follows:

**Marks** refers to and includes (i) the Kolache Factory service mark and logo, (ii) the Kolache Factory trade name, (iii) the elements and components of a Store's Trade Dress, and (iv) any and all additional or different trade names, trademarks, service marks, logos and slogans that Company adopts to identify the Kolache Factory Network and the products and services Stores offer.   The Kolache Factory registered trademarks are described in Exhibit A.

**Copyrighted Materials** refers to and includes all versions, variations and adaptations of the following materials in tangible form, either produced by Company, produced on its behalf as works for hire, or derived from works produced by or on behalf of Company: (i) all manuals used in a Store's development, operation and marketing activities, including but not limited to the Operations Manual, (ii) training materials (including printed, audio, video or electronic materials), (iii) Store plans and specifications that are works for hire, (iv) menu board designs and graphics, (v) product identification posters and photographs, (vi) advertising and marketing materials, (vii) labels, forms and reports provided by Company, (viii) any computer software developed by Company or as works for hire for use in the operation of Stores, and (ix) any other materials protected by copyright law or marked or identified by Company as protected by copyright.

**Trade Secrets** means the components of the System, the contents of the Operations Manual and of all employee training materials and computer programs developed by Company or in accordance with its specifications, and any other confidential information that Company imparts to Franchisee with respect to a Store's operation or management, whether through the Operations Manual or otherwise.

**System** means the compilation of operating procedures, marketing concepts, management techniques, and communications methods and procedures that Company has developed or adopted to govern the operation of Stores, the marketing of their products and services, and the methods of communication between and among Company and Store operators.

17.   KFF and Tasone further agreed to certain noncompetition provisions. Specifically, Tasone agreed that for two years after termination of the Franchise Agreement it would not own or operate, directly or indirectly, or accept employment by or hold an interest in any bakery that produces kolaches as a principal product or in any quick service food business

that services kolaches as a primary menu item.  (Ex. A., § 19(a)).  In addition to any other remedies available to KFF at law or in equity, if Tasone failed to honor its noncompetition agreement, then KFF would be entitled to receive throughout the term of the covenant, in addition to other remedies available to KFF at law or in equity, and Tasone agreed to pay, a weekly fee equal to 10% of the competing operation's revenues.  (Ex. A, § 18(e)).

18.    KFF and Tasone further agreed to certain liquidated damages provisions. Specifically, if Tasone continued to use any of the Marks or any element of the System in connection with the continued operation of the Store or otherwise after termination of the Franchise Agreement, then, in addition to any other remedies available to KFF at law or in equity, KFF would be entitled to collect from Tasone, and Tasone agreed to pay, a weekly royalty for such use of the Marks and/or the System equal to 150% of the royalties that Tasone would otherwise have been obligated to pay under Section 10 of the Franchise Agreement.  (Ex. A, § 18(a)).

19.    KFF and Tasone further agreed that KFF may recover damages and costs of enforcement (including reasonable attorney's fees) from Tasone, Boles, and Elez for the unauthorized use of any Mark and/or Trade Secret or the unauthorized use, copying or distribution of any time of Copyrighted Materials, and for any loss of customer or future Franchisee goodwill in the Store's trade area.  (Ex. A, § 17(i)).  Exhibit B to the Franchise Agreement defines the Store's trade area as a one mile radius from the approved location, which is 9998 West Colfax Avenue, Lakewood, Colorado 80215.

20.    In the event Tasone failed to cure any default before the remedial period expired, Tasone agreed that KFF was entitled at its sole discretion to terminate the Franchise Agreement and Tasone's rights thereunder.  (Ex. A, § 17(a)).  Upon termination of the Franchise Agreement,

Tasone's right and privilege to use the Marks, the Copyrighted Materials, the Trade Secrets and all components of the Operations Manual would absolutely and unconditionally cease.[1]  (Ex. A, § 17(a)).

21.     Finally, KFF and Tasone agreed in the Franchise Agreement that KFF shall be entitled to injunctive or similar relief, without bond, against Tasone, Boles and Elez: (i) to enforce compliance with the post-termination requirements; and (ii) to restrain the unauthorized or violative use of any Mark, item of Copyrighted Materials or Trade Secret.  (Ex. A, §§ 17(c), 17(h)).

***Tasone's Breaches of the Franchise Agreement***

22.     On July 6, 2016, KFF's representative inspected Tasone's Store and discovered numerous material deficiencies in operations and food product preparation, storage and usage, each of which constituted a separate and actionable default under Section 16(b)(3) of the Franchise Agreement.   Further, KFF discovered that Boles was effectively acting in a General/Kitchen Manager capacity without having satisfactorily completed and received certification from KFF's training program pursuant to Sections 7(d)(3) and 7(d)(9).

23.     Two days later, KFF sent a Notice of Default to Tasone via email, certified mail and overnight delivery outlining the aforementioned defaults and providing 30 days to cure the defaults pursuant to Section 16(b)(3) of the Franchise Agreement.  A true and correct copy of the Notice of Default is attached hereto as Exhibit "C."

24.     On August 22, 2016, KFF representatives visited the Store to confirm if Tasone had cured its material defaults described in the Notice of Default.  During this Store visit, KFF discovered that not only were all or substantially all of the material defaults set forth in the

---

[1] Capitalized words not otherwise defined herein shall have the meanings ascribed to them in the Glossary of Terms attached to the end of the Franchise Agreement.

Notice of Default uncured and ongoing, KFF also discovered additional material defaults including the ordering and use of unapproved croissant triangles, the use of unapproved uniforms, and the improper processing and preparation of dough. In an effort to avoid a protracted dispute, KFF sent Tasone a letter outlining the uncured and additional defaults and proposing terms to settle the dispute.

25.     On September 7, 2016, KFF sent a Notice of Termination and Demand for Satisfaction of Post-Termination Obligations to Tasone via email and overnight delivery because Tasone had failed to take any actions to cure its material defaults. KFF demanded that Tasone immediately comply with all post-termination obligations set forth in the Franchise Agreement, including but not limited to those obligations set forth in Sections 17, 18 and 19 of the Franchise Agreement.

26.     On September 19, 2016, KFF sent a Cease and Desist Letter to Tasone via email and overnight delivery based on evidence and information that Tasone was currently operating a competing "Kolache House Bakery" restaurant on the premises of the former Store that "produces kolaches as a principal product" and "serves kolaches as a primary menu item" in direct violation of Section 19(a) and 19(b) of the Franchise Agreement. Further, KFF has evidence and information that Tasone has used or continues to use KFF's Marks, Copyrighted Materials, the System and/or Trade Secrets in direct violation of Section 17(a) of the Franchise Agreement, including but not limited to certain proprietary recipes and product vendors. The Cease and Desist Letter provided Tasone a final opportunity to timely act and comply with its express obligations under the Franchise Agreement and the Notice of Termination.

27.     Tasone failed to act or comply with its express obligations under the Franchise Agreement and the Notice of Termination.

28.     First, Tasone did not pay KFF all amounts due under the Franchise Agreement and otherwise related to Tasone's actions, which payments include: (i) past due amounts set forth on Exhibit A to the Cease and Desist Letter; (ii) liquidated damages pursuant to Sections 18(a), 18(b) and/or 18(c) based on Tasone holding over and continuing to operate as a Kolache Factory Store after the date of the Notice of Termination and Tasone's current and continuing breaches of the post-termination covenants against competition as set forth in Section 19; (iii) lost profit damages based on Tasone's failure to operate the Store for the full duration  of the Franchise Agreement; and (iv) all attorney's fees and related costs incurred by KFF related to the Notice of Default, Notice of Termination, Tasone's breach of the Franchise Agreement and all enforcement efforts thereunder.

29.     Second, Tasone did not immediately discontinue all use of the Marks, Copyrighted Materials, System and Trade Secrets, and Tasone did not immediately return materials and media designated by KFF as containing Trade Secrets or constituting proprietary items including two hard drives with KFF's propriety information.

30.     Third, Tasone did not refrain from divulging or using any secret or confidential information, trade practices, and/or trade secrets related to KFF's business and of which Tasone became familiar only through its training and operation of a Kolache Factory Store under the terms of the Franchise Agreement.

31.     Last, Tasone, Boles and Elez continue to own and operate a bakery that produces kolaches as a principal product and/or own and operate a food business that serves kolaches as a primary menu item in violation of the covenant against competition in the Franchise Agreement.

32.     As a result of Tasone's violations of the Franchise Agreement, Boles and Elez have breached their Guaranty to the Franchise Agreement.

33.     Defendants' actions and omissions not only constitute breaches of the Franchise Agreement and the Guaranty, but they also constitute violations of the Texas Uniform Trade Secret Act and other tortious conduct.

## V.
## CAUSES OF ACTION

### COUNT I: Breach of Contract – Franchise Agreement
### *(Against Defendant Tasone)*

34.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

35.     The Franchise Agreement is valid and enforceable in all respects.

36.     KFF fully performed its obligations and duties under the Franchise Agreement.

37.     Tasone breached the Franchise Agreement by, among other things: (i) failing to abide by the requirements and obligations related to operating the Store; (ii) taking, disclosing and/or using KFF's confidential information and proprietary information; (iii) competing against KFF in violation of the noncompetition provision; and (iv) failing to pay all amounts due under the Franchise Agreement and Notice of Termination.

38.     Tasone's breaches directly and proximately caused damages and injury to KFF within the jurisdictional limits of this Court.

39.     Tasone's breaches entitle KFF to monetary payments pursuant to the liquidated damages provision of the Franchise Agreement.  (Ex. A, §§ 18(a), 18(c)).

40.     As a result of the breaches of the Franchise Agreement by Tasone, KFF also has been irreparably damaged by, among other things, loss of its confidential information, damage to its goodwill and client relationships, and loss of the benefit of the Franchise Agreement.  This damage cannot be adequately remedied by the award of monetary damages and KFF is therefore

entitled to a permanent injunction requiring Tasone to adhere to the terms of the Franchise Agreement and prohibiting Tasone from violating the terms therein.

<div align="center">

**COUNT II: Breach of Contract – Guaranty**
*(Against Defendants Boles and Elez)*

</div>

41.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

42.     The Guaranty is valid and enforceable in all respects.

43.     KFF fully performed its obligations and duties under the Guaranty.

44.     Boles and Elez breached the Guaranty because Tasone has not faithfully and punctually performed each and every duty and obligation it owes under the Franchise Agreement, nor has Tasone paid in full all monetary obligations it became obligated to pay KFF pursuant to the Franchise Agreement.

45.     Boles and Elez's breaches directly and proximately caused damages and injury to KFF within the jurisdictional limits of this Court.

46.     Boles and Elez's breaches entitle KFF to monetary payments pursuant to the liquidated damages provision of the Franchise Agreement, which is expressly incorporated into the Guaranty and constitutes a continuing obligation even after termination of the Franchise Agreement.  (Ex. A, §§ 18(a), 18(c)); Ex. B, p.1).

47.     As a result of the breaches of the Guaranty by Boles and Elez, KFF has been irreparably damaged by, among other things, loss of its confidential information, damage to its goodwill and client relationships and loss of the benefit of the Guaranty.  This damage cannot be adequately remedied by the award of damages and KFF is therefore entitled to a permanent injunction to require that Boles and Elez adhere to the terms of the Guaranty and prohibiting Boles and Elez from violating the terms therein.

**PLAINTIFF'S VERIFIED ORIGINAL PETITION AND**
**APPLICATION FOR PERMANENT INJUNCTION**                                          PAGE 11

## COUNT III: Violation of Texas Uniform Trade Secrets Act
### *(Against all Defendants)*

48.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

49.     This cause of action is brought under the Texas Uniform Trade Secrets Act ("TUTSA"). TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*

50.     KFF owns trade secrets, including, without limitation, components of the System, the contents of the Operations Manual and of all employee training materials and computer programs developed by KFF or in accordance with its specifications, and any other confidential information that KFF imparts to Tasone with respect to a Store's operation or management, whether through the Operations Manual or otherwise. KFF derives independent economic value from these trade secrets not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. These trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

51.     Tasone, Boles, and Elez misappropriated these trade secrets, by disclosing and using these trade secrets by using improper means to acquire knowledge of the trade secrets, and at the time of disclosure or use, they knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use and/or derived from or through a person who owed a duty to KFF to maintain its secrecy or limit its use.

52.     Defendants' wrongful use or disclosure of the confidential information and trade secrets of KFF has, and will continue to, seriously damage KFF in an amount that is not presently ascertainable, but is in excess of the Court's minimum jurisdictional limit.

53.     Because Defendants will continue their acts of misappropriation or threatened misappropriation of KFF's confidential information and trade secrets, which will irreparably injure KFF, KFF requests that the Court enjoin Defendants' improper activities.

54.     Defendants' misappropriation was willful and malicious.

55.     KFF is entitled to and seeks injunctive relief under TEX. CIV. PRAC. & REM. CODE § 134A.003 and attorney's fees under TEX. CIV. PRAC. & REM. CODE § 134A.005.

56.     KFF also seeks damages against Defendants for their misappropriation pursuant to TEX. CIV. PRAC. & REM. CODE § 134A.004, including, without limitation, actual loss and unjust enrichment caused by the misappropriation and, alternatively, seeks a royalty, for Defendants' unauthorized disclosure and use of the trade secrets.

<div align="center">

**COUNT IV: Unfair Competition**
*(Against all Defendants)*

</div>

57.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

58.     As described in this Petition, Defendants have engaged in business conduct that is contrary to honest practice in industrial and commercial matters.  Defendants' actions are both illegal and tortious.

59.     Defendants' illegal and tortious acts, as described in this Petition, have interfered with KFF's ability to conduct its business.

60.     By reason of, and as a direct result of, Defendants' acts of unfair competition, Defendants will benefit.

61.     As a direct result of Defendants' unfair competition, Defendants have damaged and will continue to damage KFF in an amount that is not presently ascertainable, but is in excess of the minimum jurisdictional limits of this court.

62.     Defendants will continue their acts of unfair competition, which will irreparably injure KFF, unless this Court enjoins their improper activities.  KFF is therefore entitled to a permanent injunction to prevent this unfair competition in the future.

63.     KFF is also entitled to all damages caused by Defendants' unfair competition and exemplary damages.

## V.
## DAMAGES

64.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

65.     As a result of Defendants' actions, KFF has been damaged in an amount that exceeds this Court's minimal jurisdictional limits.  Accordingly, KFF requests all actual damages resulting from, or proximately caused by, Defendants' actions, including, without limitation, lost profits.  KFF also requests pre-judgment and post-judgment interest on any award of damages along with its costs of court and attorney's fees.

## VII.
## ATTORNEY'S FEES

66.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

67.     KFF has been required to hire counsel and has incurred and will continue to incur reasonable and necessary attorney's fees in connection with the filing and pursuit of this action. KFF is entitled to reasonable and necessary attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 38.001 *et seq.* and 134A.001 *et seq.*

68.     All conditions precedent to the recovery of fees has occurred or will occur prior to the trial of this matter.

# VII.
## APPLICATION AND REQUEST FOR INJUNCTIVE RELIEF

69.     KFF incorporates the preceding allegations of this Petition herein by reference as if set forth in full.

70.     There is a substantial likelihood that KFF will prevail on the merits of its claims against Defendants.   Unless permanently enjoined, Defendants' wrongful breaches of the Franchise Agreement and the Guaranty, their use and disclosure and/or inevitable use and disclosure of KFF's confidential information and trade secrets, their continued violation of the covenant against competition and their acts of unfair competition will cause and continue to cause irreparable harm to KFF for which there is no adequate remedy at law, including, without limitation, loss of business, loss of goodwill, loss of competitive position in the marketplace, damage to its business reputation, confusion of clients, loss of confidential and proprietary information and trade secrets, and loss of the benefit of the bargain of its contracts.   Money damages cannot adequately compensate KFF, even if Defendants were able to respond in payment of money damages.   Monetary damages are inadequate and, as Defendants have agreed, KFF will be irreparably harmed if Defendants breach their agreements, which are reasonably necessary to protect the legitimate business interests of KFF.   (Ex. A, §§ 17(c), 17(h), 19(c)).

71.     KFF will suffer irreparable injury if a permanent injunction is not granted against Defendants and Defendants are permitted to continue to use and disclose KFF's confidential information and trade secrets, engage in unfair competition, breach their agreements, violate their covenant against competition for their own personal use and benefit or for the benefit of a competitor.

72.     The harm to KFF is imminent, and if the Court does not issue a permanent injunction, KFF will be irreparably injured.   Any damage to KFF's proprietary and confidential

information, business relationships, reputation, goodwill, contracts and competitive interests will result in irreparable harm to KFF.

73.     KFF has no adequate remedy at law because the wrongful use and dissemination of KFF's confidential information and trade secrets and harm to its business relationships and reputation cannot be adequately remedied by the award of damages.  Furthermore, greater injury will be inflicted upon KFF by the denial of injunctive relief than would be inflicted upon Defendants by the granting of such relief.  By granting injunctive relief, Defendants will be required to abide by their common law, statutory and contractual obligations not to use or disclose KFF's confidential information and trade secrets in breach of the Franchise Agreement and the Guaranty.

74.     The issuance of injunctive relief will not disserve the public interest.  Balancing the equities and other factors, the significant potential of irreparable harm to KFF without injunctive relief and the lack of harm due to the entry of a permanent injunction demonstrate that the relief will not disserve the public interest.

75.     KFF is specifically authorized by Sections 17(c) and 17(h) of the Franchise Agreement to seek injunctive or other similar relief from a court of competent jurisdiction, and the relief requested requires the restraint of acts that are prejudicial to KFF.  (Ex. A).

WHEREFORE, KF Franchising, Ltd. requests that the Court enter a permanent injunction ordering that:

a.      Defendants TASONE inc., Steve Boles, Razije Elez and their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are enjoined from:

(i)     Acquiring, disclosing or using KFF's Marks, Copyrighted Materials, or Trade Secrets, including, without limitation, components of the System,

the contents of the Operations Manual and of all employee training materials and computer programs developed by KFF or in accordance with its specifications, and any other confidential information that KFF imparts to Tasone with respect to a Store's operation or management, whether through the Operations Manual or otherwise;

(ii) Destroying, erasing or failing to maintain all records or documents, in any form or media, in Defendants' possession, custody or control which relate in any way to KFF or its Marks, Copyrighted Materials or Trade Secrets;

(iii) Communicating, publishing, disclosing, divulging, using or authorizing anyone else to communicate, publish, disclose, divulge or use, for the benefit of Tasone or any other person, partnership, association, corporation or other entity, any secret or confidential information related to the business, trade practices, trade secrets, methods of operation, sales, promotion, marking, technology, know-how or recipes of Kolache Factory or its Affiliates, the System, or operation of the Store which may have been communicated to Tasone or of which Tasone may have been apprised by virtue of Tasone's operation under the terms of the Franchise Agreement;

(iv) Copying any materials containing Marks, Copyrighted Materials, or Trade Secrets;

(v) Owning or operating, directly or indirectly, or accepting employment by or holding an interest in any bakery that produces kolaches as a principal product or in any quick service food business that services kolaches as a primary menu item that is located in the Designated Market Area (as defined in the Franchise Agreement) in which the Store was located and in each other Designated Market Area in which a KFF-owned or franchised Store is operating or under development;

(vi) Using, displaying, or failing to remove or alter all interior and exterior Kolache Factory signs and other uses of the Marks at the Store's premises; and,

(vii) Using, displaying, or failing to remove or alter all Trade Dress items and distinctive features of the Store concept, including all trade dress and related colors (specifically the color red and all baker and rolling pin depictions) including wall graphics and landscape images, uniforms, menu board graphics, counters and arches, all menus, bags and boxes) and cease identifying themselves as a current or former Kolache Factory franchisee.

b.  Defendants TASONE inc., Steve Boles, Razije Elez and their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the order by personal service

or otherwise are further enjoined from:

(i)    employing or soliciting for employment any person who is employed by KFF, Kolache Factory Inc., any affiliate of KFF or Kolache Factory Inc., or any other franchisee in KFF's franchise system or directly or indirectly inducing any such person to leave such employment.

## VIII.
## PRAYER

KFF respectfully requests that Defendants be cited to appear and answer and that the Court award KFF:

(a)    permanent injunctive relief as requested herein;

(b)    judgment against Tasone, Boles and Elez for actual damages, including, without limitation, lost profits;

(c)    damages against Tasone, Boles and Elez for their misappropriation pursuant to TEX. CIV. PRAC. & REM. CODE § 134A.004, including, without limitation, actual loss and unjust enrichment caused by the misappropriation and, alternatively, royalties, for Tasone, Boles and Elez's unauthorized disclosure and use of the trade secrets;

(d)    prejudgment and post-judgment interest, as allowed by law;

(e)    attorney's fees, expenses, and costs of suit pursuant to the Franchise Agreement, the Guaranty, TEX. CIV. PRAC. & REM. CODE §§ 38.001 *et seq.* and 134A.001 *et seq.*, and the Texas Uniform Trade Secrets Act; and

(f)    all other relief to which KFF is entitled, legal or equitable, general or special.

Respectfully submitted,

*Deborah S. Coldwell*

Deborah S. Coldwell
State Bar No. 04535300
deborah.coldwell@haynesboone.com
Taylor Rex Robertson
State Bar No. 24093050
taylor.robertson@haynesboone.com
HAYNES AND BOONE, L.L.P.
2323 Victory Avenue - Suite 700
Dallas, Texas 75219
Telephone:        (214) 651-5000
Facsimile:        (214) 651-5940

Elizabeth E. Klingensmith
Texas Bar No.: 24046496
Liz.klingensmith@haynesboone.com
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas 76102
Telephone:        (713) 547-2592
Facsimile:        (713) 236-5495

**ATTORNEYS FOR KF FRANCHISING, LTD.**

Unofficial Copy Office of the Harris County District Clerk

## VERIFICATION .

STATE OF TEXAS                     §
                                   §
COUNTY OF HARRIS                   §

Dawn Nielsen, being duly sworn, states that she has read the foregoing Plaintiff's Verified Original Petition and Application for Permanent Injunction, that she is the current Vice President of Kolache Factory Inc., that she is authorized to make this verification on behalf of KF Franchising, Ltd., and that the factual information and allegations contained in Paragraphs 7 through 32 are true and correct based upon her personal knowledge, the records of KF Franchising, Ltd., and/or information available through employees of KF Franchising, Ltd., except for any matters stated on information and belief, which she believes to be true.

_____
Dawn Nielsen

SUBSCRIBED AND SWORN TO BEFORE ME on the 21 day of September, 2016.

_____
Notary Public in and for the State of Texas

VICKI D. KOZEL
Notary ID # 3732483
My Commission Expires
October 27, 2019

# EXHIBIT A





**KF FRANCHISING, LTD.**

**FRANCHISE AGREEMENT**
**FOR A**
**KOLACHE FACTORY STORE**

# TABLE OF CONTENTS

**SECTION**                                                       **PAGE NO.**

1. RECITALS. ........................................................................................................... 1
2. GRANT OF FRANCHISE. ..................................................................................... 1
3. INITIAL FEES. ...................................................................................................... 2
4. COMPETITIVE PROTECTION. ........................................................................... 2
5. MODIFICATION OF CONCEPT, TRADE DRESS AND EQUIPMENT STANDARDS. ...... 4
6. COMPANY SERVICES AND ASSISTANCE. ....................................................... 5
7. FRANCHISEE'S PERFORMANCE. ....................................................................... 7
8. ADVERTISING AND PROMOTIONS. ................................................................. 13
9. CONCERNING THE INTERNET. ......................................................................... 15
10. ROYALTIES. ....................................................................................................... 17
11. TERM AND RENEWAL. ..................................................................................... 17
12. USE OF INTELLECTUAL PROPERTY. ............................................................. 18
13. TRANSFERS. ...................................................................................................... 21
14. INTEREST ON DELINQUENT ACCOUNTS. ..................................................... 25
15. STORE RELOCATION. ....................................................................................... 25
16. DEFAULT. ........................................................................................................... 26
17. TERMINATION; OTHER REMEDIES. ............................................................... 29
18. LIQUIDATED DAMAGES. .................................................................................. 31
19. COVENANT AGAINST COMPETITION. ........................................................... 32
20. PARTIAL INVALIDITY. ..................................................................................... 32
21. NOTICES. ............................................................................................................ 32
22. STATUS OF PARTIES. ....................................................................................... 33
23. BINDING EFFECT. ............................................................................................. 33
24. LAW GOVERNING; DISPUTE RESOLUTION. ................................................. 33
25. CONDITION PRECEDENT. ................................................................................ 35
26. MISCELLANEOUS. ............................................................................................ 35
27. FRANCHISEE'S ACKNOWLEDGMENTS. ........................................................ 35

## STATE SPECIFIC ADDENDA

## EXHIBITS:

A: DESCRIPTION OF MARKS
B: DESCRIPTION OF APPROVED LOCATION AND TRADE AREA
C: AMENDMENT TO FRANCHISE AGREEMENT
D: FORM OF LEASE RIDER
E: AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS
F: ASSIGNMENT OF TELEPHONE NUMBER(S)

    GLOSSARY OF TERMS
    GUARANTY AND ACKNOWLEDGMENT

## SUMMARY PAGE

Effective Date: _____ Jan. 30, 2015 ____ Store No. ___ 094 ___

Franchisee: _____ TASONE LLC _____

Entity type (circle one): Corporation ( LLC ) General Partnership · Ltd. Partnership

Store Street Address: __ TBD _____

Phone Number: _____ TBD _____ Fax Number: _____ TBD _____

E-Mail Address: ____ store94@kolfac.com _____

General Manager:____ Raza Elez _____

Trade Area boundaries are described in Exhibit B.

Franchise Fee (circle one): 35,000 (1st Store) (See Exhibit C) $28,000 (additional Store)

Option fee $7,000

Royalty Rate: 5% Ad Fund Rate: 3% Website/Intranet Fees: $25/month each

Scheduled Opening Date:_____ TBD _____ Term: 10 years from the Effective Date

Initial Insurance Coverage (until Operations Manual specifies otherwise):

Certificate Received:_____

Workers Compensation Insurance, General liability insurance with policy limits of $1,000,000 per occurrence; $2,000,000 aggregate; umbrella coverage of $2,000,000. Each policy must (1) be obtained from an insurance carrier with a Best's Insurance Reports rating of A, Class VIII, or better; (2) name Company as an additional insured and afford separate coverage to each named insured; (3) provide for a deductible of not more than $500 per occurrence; (4) contain no provision that limits or reduces Franchisee's coverage on account of a claim against Franchisee by Company; and (5) provide for not less than 30 days' prior notice to Company of cancellation or non-renewal.

ADDRESSES FOR NOTICES:

    Company:    KF Franchising Ltd.
                23240 Westheimer Parkway, Suite A
                Katy, Texas 77494
                Attn. President

    Franchisee:   TASONE LLC
                6633 Welch St.
                Arvada, CO 80004

STORE NO. ___094___



# FRANCHISE AGREEMENT
## FOR A
## KOLACHE FACTORY STORE

THIS AGREEMENT is entered into between KF Franchising, Ltd., a Texas limited partnership ("Company"), and the franchisee identified in the signature block of this Agreement ("Franchisee"). Certain terms are used in this Agreement with the meanings assigned in the Glossary of Terms appended to this Agreement. That Glossary is incorporated into, and made an integral part of, this Agreement by reference.

**1. Recitals.**

Company has developed a distinctive System to guide and govern the operation of retail bakeries that sell various kinds of kolaches and complementary menu items and that operate under the Kolache Factory® trade name. Company operates and franchises the operation of Stores. Franchisee has submitted an application for a franchise to operate a Store, and Company has approved Franchisee's application. The parties are now ready to embark on a franchise relationship and have entered into this Agreement to evidence the terms and conditions of their relationship.

**2. Grant of Franchise.**

(a) Subject to the terms, conditions and limitations of this Agreement, Company grants to Franchisee a franchise to operate a Store at the Approved Location specified on the Summary Page. Franchisee's use of any of the Marks or any element of the System in the operation of a business at any other location or in any other channel of distribution without Company's express written authorization will constitute willful infringement of Company's rights in the Marks and the System.

(b) The franchise includes the following rights and licenses:

(1) Authorization to operate the Store under the Kolache Factory® trade name, in association with the Kolache Factory service mark and in accordance with the System;

(2) Authorization to install the Trade Dress and exterior and interior signs bearing the Kolache Factory® name and logo at the Store;

(3) Authorization to provide Catering and Delivery Service from the Store; and

(4) Authorization to use the Marks to identify, advertise and promote the Store's products and services.

(c) Franchisee shall acquire no rights or authority under this Agreement or as an element of the franchise:

(1)     To sell to any wholesale or retail customer the ingredients (including Company's proprietary kolache dough) from which any menu item is made;

(2)     To provide Delivery Service outside the Store's Trade Area;

(3)     To provide Catering outside the DMA or within the physical boundaries (including the parking lot) of the shopping center, mall or building in which another operator's Store is located; or

(4)     To sell Kolache Factory brand food, memorabilia or other merchandise from a Special Outlet, an Internet Website or a catalogue without Company's express prior permission.

(5)     To ship Kolache Factory brand food, products or other merchandise.

(d)     Company reserves all rights that this Agreement does not expressly grant to or confer upon Franchisee.

## 3.     Initial Fees.

(a)     In consideration of Company's granting the franchise, Franchisee must pay Company a franchise fee of \$35,000, if this Agreement covers Franchisee's first Store, or of \$28,000, if this Agreement covers Franchisee's second or a later Store. The franchise fee will be payable in full when Franchisee signs this Agreement. See Exhibit C, Amendment to Franchise Agreement.

(b)     Company may charge a reasonable management fee for its review and consideration of information submitted by Franchisee for retaining the services or purchasing goods from a proposed alternative vendor or supplier to the ones that Company has previously designated or approved. If Franchisee fails to secure our prior approval for an architect or a construction contractor, Franchisee agrees to pay the reasonable costs to Company for oversight of construction.

(c)     If Franchisee does not locate and obtain possession of a suitable site for the Store or is not able to secure acceptable financing within six months after the Effective Date, either Franchisee or Company may terminate this Agreement at any time within the next 30 days by written notice to the other. If Franchisee does not satisfactorily complete the initial training program and does not open the Store within twelve months after the Effective Date, Company many terminate this Agreement within the next 30 days by written notice to Franchisee. In these cases, Company will retain 25% of the franchise fee paid to compensate Company for a lost opportunity and for the time, effort and expense Company devoted to the relationship with Franchisee, and will refund the balance and any prepaid portion of the fees referenced above for services that Company has not yet performed as of the termination date. If the Franchise Agreement is terminated before the Store is opened, Franchisee shall return the contents of the grand opening package to Company. Franchisee shall be responsible for costs to return such materials. All refunds will be payable only if Franchisee gives Company an unconditional, general release of all claims Franchisee may have against Company and its affiliates. The Company will owe no interest on amounts that it refunds to Franchisee.

## 4.     Competitive Protection.

(a)     Company does not grant exclusive territories, but does provide its franchisees protection against some forms of competition inside a geographic Trade Area. Exhibit B to this Agreement describes the Trade Area that Company has assigned to the Store. Franchisee will enjoy competitive protection in the Trade Area to the extent the following paragraphs of this Section 4 expressly provide. Franchisee will have no protection against competition from Stores, Special Outlets or other

establishments located anywhere outside the Trade Area's physical boundaries, even if these establishments market their products and services in, provide Catering in, or draw customers from the Trade Area. On the other hand, there will be no limitation on the geographic area in which Franchisee may advertise and promote the Store or from which the Store may draw customers, except that Franchisee may not advertise or promote the Store in the Trade Area of another Franchisee.

(b) Company will not open or authorize anyone except Franchisee to operate a Store in the Trade Area. For purposes of this commitment, "Store" has the precise, restricted meaning assigned in the attached Glossary of Terms. This protection will not apply to, and Franchisee will have no competitive protection from, Special Outlets that Company, another franchisee or a licensee operates, either permanently, temporarily or seasonally, in a Mall, Institution or Hospitality Center located in the Trade Area.

(c) If an opportunity arises to develop a Special Outlet in the Trade Area, except as provided in the next sentence, Company promises not to pursue or authorize anyone else to pursue the opportunity without first determining Franchisee's interest in the project and evaluating Franchisee's qualifications to pursue it. Company will have no obligation to notify Franchisee of or to consider Franchisee for the opportunity if the facility in which the Special Outlet will operate is an Institution or Hospitality Center and the facility's owner or manager sets financial, experience or organizational standards for an acceptable operator that Franchisee does not satisfy at the time the opportunity becomes available. Franchisee acknowledges that the managers of many Institutions and Hospitality Centers will deal only with experienced, institutional food service companies, and that Franchisee may not satisfy their financial, experience or organizational criteria.

(d) In evaluating Franchisee's qualifications to develop and operate a Special Outlet in the Trade Area, Company will take into account Franchisee's financial strength, management and organizational capabilities, prior performance as a Kolache Factory franchisee, and other factors Company considers relevant to a sound business decision. Company promises to exercise reasonable business judgment in conducting its evaluation, but its decision regarding Franchisee's qualifications will he final and conclusive. If Company decides that Franchisee is qualified to pursue the opportunity, Company and Franchisee will, at Company's option, sign either an amendment to this Agreement or a separate agreement that evidences the nature and extent of Franchisee's rights to operate the Special Outlet. If Company decides that Franchisee is not qualified to pursue the opportunity, Company will be free to pursue it, either directly or through another franchisee or licensee.

(e) Franchisee will have no competitive protection from Catering activities that Company or other franchisees conduct in the Trade Area, except within the physical boundaries (including the parking lot) of the shopping center, mall or building in which the Store is located. On the other hand, Franchisee may freely compete for Catering opportunities both inside and outside the Trade Area, so long as Franchisee does not engage in Catering outside the DMA or within the physical boundaries (including the parking lot) of the shopping center, mall or building in which another operator's Store is located.

(f) The competitive protection this Section 4 provides to Franchisee will not to any extent prohibit or restrict Company or its affiliates from engaging in the distribution of refrigerated or frozen kolaches or the ingredients from which kolaches are made (including the Kolache Factory proprietary dough), under the Kolache Factory name or any other name in supermarkets, hypermarkets (e.g., Walmart, Sam's Club, etc.), convenience stores and grocery stores, or from engaging in the distribution of shirts, hats and other memorabilia, and other products and merchandise, whether or not identified by or associated with the Kolache Factory brand name or logo, to or through commercial establishments that are not affiliated with Company or associated with the Kolache Factory Network. Company and its affiliates may exercise their distribution rights, both inside and outside the Trade Area, without infringing Franchisee's competitive protection rights.

(g) The competitive protection this Section 4 provides to Franchisee will not prohibit or restrict Company or its affiliates from selling Kolache Factory brand kolaches, memorabilia and other merchandise to customers inside the Trade Area through catalogues, telemarketing campaigns, an Internet Website and other direct-order techniques. Company and its affiliates may distribute catalogues and similar sales solicitation materials in the Trade Area, broadcast television and radio commercials for direct-order merchandise into the Trade Area, transmit electronic messages into and accept e-commerce orders from residents of the Trade Area, initiate telephone contact with and accept telephone orders from residents of the Trade Area, and fill customer orders for direct-order merchandise in the Trade Area, without in any such case infringing Franchisee's competitive protection rights.

(h) Franchisee acknowledges and agrees that Company has no express obligation or implied duty to insulate or protect Franchisee's revenues from erosion as the result of the Store's competing with other Stores or with Special Outlets located outside the Trade Area; with Special Outlets located inside the Trade Area as permitted in Section 4(b); or as a result of Company's competing, or allowing other franchisees to compete, with the Store in the ways and to the extent this Section 4 provides or contemplates. Franchisee expressly waives and relinquishes any right to assert any claim against Company based on the existence, actual or arguable, of any such obligation or duty.

## 5. Modification of Concept, Trade Dress and Equipment Standards.

(a) Company reserves the right to modify the System and the Store concept, Trade Dress and equipment package from time to time for a variety of reasons. These reasons include the need (i) to respond to changes in consumer expectations and buying trends, (ii) to seize efficiencies made possible by growth of the Kolache Factory Network, (iii) to implement efficiencies made possible by technological advances or as a result of Company's research and development activities, (iv) to implement co-branding alliances with other companies, and (v) to meet competition. Company reserves the right and discretion (1) to add new and different menu items to the list of authorized Store merchandise, (2) to withdraw menu items from the list of authorized Store merchandise, or to change their names, recipes and image, (3) to change the Trade Dress, equipment and fixtures standards for Stores, (4) to add or change the standards for customer services (such as Catering and Delivery Service), (5) to abandon the use of equipment, fixtures and merchandising displays for any menu item that Company withdraws from the list of authorized Store merchandise, and (6) to require the use of new or different electronic data processing and communications equipment and facilities.

(b) If the addition of a menu item or product to the authorized merchandise list would not require the installation of new fixtures or equipment (other than items Company classifies as smallwares), Company may instruct Store franchisees to begin offering the new menu item as of a date specified in a supplement to the Operations Manual. Similarly, if the deletion of a menu item or product from the authorized Store merchandise list would not require the removal of fixtures or equipment (other than items Company classifies as smallwares), Company may direct Store franchisees to cease offering the product as of a date specified in a supplement to the Operations Manual. Franchisee will comply with Company's instructions as of the date Company specifies, which need not be more than 30 days after Company distributes the Operations Manual supplement.

(c) If Company abandons or adopts changes in the Store operating concept that necessitate the addition or removal of furniture, fixtures, equipment, signs or Trade Dress items, Company may instruct Store franchisees to adapt their Stores to the concept change through a supplement to the Operations Manual. Company, in consultation with Franchisee, will establish a schedule for Franchisee to implement the concept change that will depend, among other factors, on the Store's size, age, and the amount Franchisee has spent in recent periods to refurbish and upgrade the Store. Franchisee will remove from the Store any items Company designates as obsolete and will purchase and install any different or

additional items Company specifies as meeting its new standards, all in accordance with the schedule Company establishes for Franchisee's Store.

(d)     Company requires that all Stores install and maintain a computer-based Information System that permits faster and more accurate communication between Company and Store franchisees. The Information System may involve or include an Intranet network that Company designs and administers for the Kolache Factory Network. Franchisee acknowledges that this Section 5 obligates Franchisee to install the type and capacity of computer, modem and peripheral equipment Company designates and to participate in the Information System in accordance with standards, protocols and procedures Company includes in the Operations Manual.

(e)     If Company allows the Store to participate in any new product test, Franchisee will participate in the test in accordance with Company's standards and specifications and will discontinue offering any product that Company decides not to add permanently to the authorized Store merchandise list.

(f)     If Franchisee develops or suggests an innovation or improvement that Company decides to incorporate into the Kolache Factory Store concept or System, either temporarily or permanently, Franchisee will assign ownership of the innovation or improvement to Company without compensation. The sole consideration for the assignment will be Company's giving Franchisee recognition and credit for the innovation or improvement in announcing it to members of the Kolache Factory Network.

## 6.     Company Services and Assistance.

(a)     **Development Stage Assistance.** To the extent Company has not provided the following services pursuant to a Development Agreement with Franchisee or its Affiliate, Company will provide the following services and assistance to Franchisee before Franchisee opens the Store.

(1)     Promptly after the Effective Date, Company will provide Franchisee a list of points to consider in evaluating a site's potential as a Store and in negotiating commercial real estate leases.

(2)     Unless Company is already familiar with the market, it will visit the area in which Franchisee proposes to locate the Store and will help Franchisee locate and informally evaluate potential sites. Company will make one one-day visit to the area at its own expense. If Franchisee requests additional or longer visits, Franchisee must pay the travel, lodging and meal expenses of the Company representatives who make a visit.

(3)     Company will review lease proposals for up to three potential sites that Franchisee preliminarily selects for closer examination, will help Franchisee identify the positive and negative points in each proposal, and will help Franchisee rank the sites in numerical order.

(4)     After Company and Franchisee agree on a ranking, Company will help Franchisee find a real estate broker who can assist Franchisee with lease negotiations.

(5)     When Franchisee and a landlord conclude negotiation of a lease that contains terms reasonably satisfactory to Company (including a Lease Rider in substantially the form of Exhibit D to this Agreement), Company will convey its approval of the site by providing Franchisee a copy of a Summary Page that shows the address of the Approved Location as the Store Street Address and an Exhibit B that indicates the boundaries of the Trade Area. The revised Summary Page and completed Exhibit B that Company provides to Franchisee will become an integral part of this Agreement. (If Franchisee decides to purchase the site, Company will provide the required Summary Page when Franchisee submits to Company a copy of the purchase contract.)

Unofficial Copy of the Chris Distributor Clerk

(6) When Franchisee provides Company an executed photocopy of the entire lease for the Approved Location, including exhibits, addenda and riders (or a copy of the deed to the site if Franchisee decides to purchase it), Company will provide Franchisee the name and contact information for one or more architects Company has designated or approved to develop construction documents for the Store's build out. Company may provide prototype construction plans for Franchisee's use. The prototype documents will not bear an architect's stamp or otherwise be suitable to satisfy the requirements for a building permit.

(7) Company will furnish Franchisee a list that describes or shows the specifications for the furniture, fixtures, equipment and signs that Franchisee must install in the Store, together with the names of suppliers Company has designated or approved, including Company and its affiliates. Franchisee can either purchase the equipment directly or have Company purchase it for Franchisee. Company will provide Franchisee the names and contact information for any general contractors Company has designated or approved, along with the sequence of events and procedures that must be followed in building out and equipping a Store. Company may, but will not be obligated, consider alternative vendors, suppliers or providers of goods and services submitted by Franchisee for approval. Franchisee must secure Company's approval prior to using any alternative vendor, supplier or provider.

(8) Company will furnish Franchisee lists of the inventory, supplies, paper goods and smallwares needed to stock and operate a Store, together with the names of any suppliers Company has designated or approved, including Company and its affiliates. These lists include the name of the supplier from whom Franchisee must purchase dough concentrate made from Company's proprietary dough recipe and the quality and grade specifications that Company has adopted for logo-imprinted paper goods and other ingredients and supplies Franchisee will need.

(9) Company will provide a training program for the individuals specified in Section 7(d)(3) at its Training Facilities in the Houston, Texas area. If this Agreement relates to Franchisee's first Store, Company will provide training without tuition charge for Franchisee and two managerial-level individuals. If this Agreement relates to Franchisee's second or subsequent Store, Company will provide training without tuition charge for one managerial-level individual. Company requires all Franchisees and certification trainees to sign our non-disclosure and confidentiality agreement before beginning training. Company requires that all attendees earn a Food Protection Manager Certification, accredited by the American National Standards Institute (ANSI)-Conference for Food Protection (CFP), before beginning training. Subject to availability of pupil space and to payment of a reasonable tuition charge, Franchisee may re-enroll or enroll others in the training program from time to time for initial or refresher training. In all cases, Franchisee must pay the travel, lodging and incidental expenses that Franchisee, the General Manager and Franchisee's other designated trainees incur to attend the training program.

(10) During training, Company will make available to Franchisee (on loan) one electronic set of the Operations Manual to be accessed through Company's Intranet or such other means determined by Company from time to time.

(11) Company will advise and assist Franchisee in planning publicity and promotions for the Store's opening. Company will provide Franchisee with a grand opening package at no charge to Franchisee. Company will match up to $3,000 of Franchisee's grand opening advertising expenses for the Store, upon Franchisee's submission of evidence of its grand opening expenses to Company. The grand opening package is described in the Operations Manual, but generally includes underwriting expenses for one direct mailing in no more than two zones, business cards, an opening inventory of gift cards, window graphics, art work for print advertising, and an opening inventory of menus, counter mats, table tents and similar printed display materials. Company may revise the grand opening package by revisions to the Operations Manual or by notice to franchisees.

(b) **Operational Assistance**. Company will provide the following services and assistance to Franchisee after the Store opens.

(1)     If this Agreement covers Franchisee's first Store, Company will send an individual who has been trained in Store operations (an "Operations Specialist") to the Store for approximately five days during the period the Store first opens for business to verify that Franchisee is operating the Store in accordance with the Operations Manual. If this Agreement covers Franchisee's second or a later Store, Company will send an Operations Specialist to the Store for the amount of time that Company considers adequate. The Operations Specialist may make travel reservations in advance, but will not depart for the Store until all construction is complete, all inspections and permits have been signed off, and all equipment and Trade Dress is installed and operational. Company may require that Franchisee provide digital photographs, photocopies, document facsimiles and other documentation to verify that these tasks have been completed prior to the Operations Specialist's departure.

(2)     Company will make its staff accessible to the General Manager for consultation by telephone, fax, written communication, e-mail and other forms of electronic communication. Company will occasionally visit the Store to conduct QSC Inspections, but will not provide routine field supervision.

(3)     Company will arrange for the production and distribution of dough concentrate made from its proprietary dough recipe or provide a proprietary dough mix in quantities sufficient to satisfy the Store's reasonable needs. Company will be relieved of any obligations to Franchisee under this Section 6(b)(4) if Franchisee fails to maintain a satisfactory payment history with the distributor from which Franchisee purchases dough products, or if Franchisee becomes significantly or habitually late in paying royalties or marketing fees on time.

(4)     Company will provide technical services and support for Franchisee's POS system, inventory control system and related computer systems, both by telephone and by onsite support. Company may charge a fee for these services in accordance with its Technical Service and Support Policy, as revised from time to time. Company may outsource these services to a third party.

(5)     Company will make available to Franchisee (on loan) electronic additions and supplements to the Operations Manual as they become available via Company's Intranet or such other means determined by Company from time to time, and will disclose to Franchisee additional Trade Secrets, if any, Company develops that relate to the operation of Stores.

(6)     So long as Franchisee complies with Franchisee's financial, operational and reporting obligations under this Agreement, Company will invite Franchisee to attend (at Franchisee's expense) all conventions, seminars and other Franchisee-oriented functions Company from time to time plans and sponsors.

(7)     Company will permit Franchisee to purchase equipment and inventory from or through any distribution network Company establishes.

(8)     Company or its affiliate may implement a loyalty, gift card or similar program for the benefit of the Kolache Factory Network, which it may discontinue at any time.

**7.     Franchisee's Performance.**

(a)     **Business Entity Requirements.**  Franchisee must be a Business Entity or file for a Business Entity within 30 days of signing this Agreement, and the following requirements apply:

(1)     The Charter Documents of Franchisee must provide that Franchisee's purposes and activities are restricted exclusively to operating Kolache Factory Stores.

(2)     True, complete and duly authenticated copies of Franchisee's Charter Documents and of a resolution of Franchisee's board of directors, general partner or other managing body authorizing Franchisee to enter into and perform this Agreement must be furnished to Company prior to the execution of this Agreement.

(3)     Franchisee's Charter Documents shall impose transfer restrictions that give effect to Section 13(a), and each certificate representing an ownership interest in Franchisee shall contain or have conspicuously noted upon its face a statement in a form satisfactory to Company to the effect that any assignment or transfer of the certificate is subject to all restrictions this Agreement imposes on transfers and assignments.

(4)     Franchisee shall maintain a list of all record and beneficial owners of equity interests in Franchisee and shall furnish a current version of the list to Company between December 15th and 31st of each year and upon request.

(b)     **Selection and Possession of Approved Location.** Franchisee must actively participate in the site selection and lease negotiation process that Section 6(a) describes. Franchisee acknowledges that responsibility for selecting an appropriate site rests with Franchisee and that Franchisee will have sole responsibility for the Approved Location's suitability.     To the extent that Franchisee has not complied with the following pursuant to a Development Agreement, Franchisee will take each of the following actions:

(1)     When Franchisee receives a preliminary draft of the proposed Store lease from the landlord, Franchisee will promptly provide Company a copy of the lease. Company will review and comment on the lease from the perspective of a tenant experienced in negotiating similar leases. However, Company will not provide legal or expert real estate advice with respect to any provision of the lease. Franchisee will negotiate the lease in good faith and will give due consideration to Company's observations and suggestions.

(2)     When Franchisee and a landlord conclude negotiation of a definitive lease agreement, Franchisee will sign the lease and furnish Company a photocopy of the executed lease, including all exhibits, addenda and riders. Alternatively, if Franchisee purchases the site, Franchisee will furnish Company a photocopy of the recorded deed.

(c)     **Pre-Construction Procedures.**

(1)     Franchisee must retain an architect approved by Company to create full construction plans suitable to obtain a building permit. Within 30 days after Franchisee leases or buys the Approved Location, Franchisee's architect must submit for Company's review and approval a complete set of construction documents, including MEP specifications, for the Store. The drawings must be based on the standards and information Company provides, including Company's required Trade Dress package. Company will have 10 days after it receives these documents to review and either approve or return marked-up documents to Franchisee's architect for corrections and resubmission. Franchisee agrees to defer signing contracts for the Store's construction, equipment, fixtures or signage until Franchisee has received Company's written approval of Franchisee's final construction documents. Franchisee's architect must provide a complete set of CAD files and three full sets of stamped and permitted construction documents, including MEP specifications, to Company prior to the start of construction.

(2)     Within 15 days after Company notifies Franchisee that it has approved the construction documents, Franchisee will submit for Company's review a minimum of three general contractors' bids for the Store's build-out, including a copy of the proposed construction contract

submitted by each contractor. Company will have 10 days after it receives these documents to review and comment on the bids and contracts from the perspective of a client experienced in negotiating similar projects. However, Company will not provide legal or expert advice with respect to any provision of the construction contract.

(3)      If Franchisee submits a bid from a general contractor other than one Company had designated or approved, Franchisee must also furnish Company a statement of the contractor's qualifications, including at least five client references and a construction project history that includes at least three restaurants. Company will have 10 days after it receives these document either to advise Franchisee of any reservations Company has about the contractor's reputation or ability or to approve the contractor. Company must approve the contractor selected by Franchisee before signing any construction contract.

(4)      Franchisee will select a contractor and negotiate the construction contract in good faith, and will give due consideration to Company's observations and suggestions. The construction contract must require the contractor to submit a schedule of construction and completion to Company, and to keep Company's management informed of any changes to the schedule.

(5)      When Franchisee and a contractor conclude negotiation of a definitive construction contract, Franchisee will sign the contract and furnish Company a photocopy of the executed contract, including all exhibits, addenda and riders, including the time schedule to complete the construction of the Store Premises.

(d)      **Construction and Operations**. In connection with the construction and operation of the Store, Franchisee agrees to fulfill the requirements, to perform the obligations and to observe the restrictions stated in this Section 7(d).

(1)      Franchisee will construct, finish out, equip, furnish and decorate the Store in compliance with Company's equipment, Trade Dress, Information Systems and signage specifications and the construction documents Company approves in accordance with Section 7(c)(2). Franchisee will be responsible for providing digital photographs to Company for construction updates on a weekly basis and at any other time Company may request. Franchisee will not open the Store for business until all construction is complete, all inspections and permits are signed off, all equipment and Trade Dress is installed and operational, Franchisee has hired the required personnel before they begin training and the required personnel have received training certification, sufficient food inventory is in stock, and permission to open has been granted by Company's onsite Operations Specialist. After the Store opens, Franchisee will not alter its furniture, fixtures, equipment, signs or Trade Dress in any fashion without Company's express prior permission.

(2)      Franchisee will affix to an exterior window or display prominently on an interior wall of the Store a decal or placard containing the following statement: "Independently owned and operated by TASONE LLC under a license from KF Franchising, Ltd." and never make a statement or representation to any person that is contrary to or inconsistent with Section 22 of this Agreement.

(3)      Company requires that all Stores have a dedicated trained and certified General Manager. A General Manager must have completed a minimum of 220 hours of training for certification. Company requires that all Stores with extended hours that require more than one shift have two dedicated trained and certified Managers. If this Agreement relates to Franchisee's first Store, Company requires that Franchisee and two managerial-level individuals satisfactorily complete and receive certification from Company's current training program before the Store may open for business. If this Agreement relates to Franchisee's first Store and the Store has extended hours that require more than one shift, Company requires that Franchisee and three managerial-level individuals satisfactorily complete training

and receive certification before the Store opens for business. If this Agreement relates to Franchisee's second Store, the General Manager may be one of the two initial certified trainees. If this Agreement relates to Franchisee's third or later Store, Company requires that an additional managerial-level individual, designated as the General Manager, satisfactorily complete training and receive certification before the Store may open for business. Managers for the Franchisee's second and subsequent Stores may be trained by Franchisee, but must satisfactorily complete and receive certification through Company's current certification program prior to the Store opening. Franchisee will ensure that the required personnel attend and satisfactorily complete the training program and that they receive certification before the Store opens for business. In the event that a Store's certified Manager leaves the employ of the Store, Franchisee will submit a replacement managerial-level individual who has completed a minimum of 220 hours training to us for Manager certification within 30 days. Company may revise the required number of hours in each Certification Training Program by amendments to the Operations Manual.

(4)     As soon as Franchisee obtains telephone, fax numbers and/or modem numbers for the Store, Franchisee will sign and deliver to Company an Assignment of Telephone Numbers for the numbers in the form attached to this Agreement as Exhibit F. If any of the Store's telephone numbers changes during the franchise's term, or if Franchisee adds additional lines for Delivery Service, a modem or other purposes, Franchisee will promptly sign and deliver to Company a new Assignment of Telephone Numbers for the new or additional number(s).

(5)     Franchisee will open the Store for business not later than the Scheduled Opening Date specified beneath the signature block of this Agreement and will operate it continuously throughout the entire term of the franchise solely under the Kolache Factory trade name and System. If the Store's completion is interrupted by a natural disaster, fire or other casualty, labor dispute, materials shortage or similar event over which Franchisee lacks control, the Scheduled Opening Date will be extended for the time reasonably necessary to remedy the effects of the occurrence.

(6)     Franchisee will (i) comply with and adhere to the policies and procedures set forth in the Operations Manual, as revised and supplemented from time to time, (ii) follow Company procedures in the preparation, baking, storage, presentation and dispensing of kolaches, other authorized menu items and other authorized Store merchandise, (iii) purchase and use fresh, processed and prepackaged ingredients that satisfy or exceed the minimum grade or quality standards Company from time to time specifies; (iv) purchase from Company or a source Company designates and exclusively use Kolache Factory brand dough balls and other proprietary products; (v) purchase inventory and supplies only from suppliers Company designates or approves from time to time; and (vi) follow Company's procedures for submission of vendors, suppliers or providers for approval who have not been previously approved or designated by Company, including the payment of a reasonable fee for such consideration by Company. Company has no obligation to approve additional vendors, suppliers or providers.

(7)     Franchisee will provide appropriate training, supervision and security for all personnel employed in the Store, maintain standards of prompt and courteous customer service, and instruct all employees of the Store in the proper use and display of the Marks and the confidential handling of the Trade Secrets and the Operations Manual, as stated in Section 12.

(8)     Franchisee will ensure that all the Store's employees follow Company's grooming and dress code and wear the Kolache Factory uniform items developed by Company.

(9)     Franchisee will notify Company promptly of any change in the General Manager, and send any new General Manager to attend and satisfactorily complete Company's training program within 30 days. Should Company find that Franchisee's certified General Manager is not up to

Company standards in product quality or management, Company may (at its choosing) require that General Manager attend training until standards are met.

(10) Without prior permission of the affected employer, Franchisee will not, directly or through others, contact, solicit or offer any inducements to any individual who is then, or within the preceding 90 days has been, an employee of Company, a Company affiliate or another Kolache Factory franchisee for the purpose of persuading or attempting to persuade the individual to accept employment by Franchisee in any capacity.

(11) Franchisee will offer all foods and beverages included on Company's standard menu, as revised from time to time, and will not offer any foods, beverages or other merchandise that is not included on Company's authorized Store merchandise list, as revised from time to time, without Company's prior written consent.

(12) Franchisee will imprint the Kolache Factory logo on all cups, containers, bags, take-out menus and other paper goods used in the Store in accordance with instructions contained in the Operations Manual, and will purchase items imprinted with the Kolache Factory logo only from suppliers Company designates or approves.

(13) Franchisee will (i) use the grand opening package that Company provides in accordance with Section 6(a)(11), (ii) will purchase as they become available and display in the Store all (A) product identification materials, (B) point-of-purchase promotional materials, (C) promotional memorabilia, merchandise and prizes, and (D) other advertising and marketing materials that Company creates or authorizes for use by Store operators and (iii) participate in and pay any fees associated with any loyalty, gift card or similar program adopted by Company for use in the Kolache Factory Network, as Company may require such program. Franchisee will purchase these materials from a source Company designates or approves, which may be Company.

(14) At Company's request, Franchisee will display in a prominent, accessible place a "franchise opportunity" display furnished by Company at its expense for the purpose of increasing public awareness of the availability of Store franchises.

(15) Franchisee will use the Marks, the Trade Secrets, the Operations Manual and other Copyrighted Materials in strict compliance with Section 12 and in a manner tending to promote the goodwill and public image of the Kolache Factory Network.

(16) Franchisee will follow Company procedures in maintaining and cleaning the Store's equipment and fixtures, and will maintain the customer seating, kitchen, bakery, storage and restroom areas of the Store in a safe and sanitary condition at all times.

(17) Franchisee will maintain the physical appearance and integrity of the Store in accordance with the repair, refurbishing and remodeling standards stated in the Operations Manual.

(18) Franchisee will permit Company representatives to conduct unannounced QSC Inspections of the Store at any time during normal business hours. If Company's representative questions the freshness, appearance or fitness for human consumption of any item displayed for purchase in the Store, Franchisee will immediately remove and destroy the questioned item. If Franchisee refuses to remove or destroy a questioned item, Franchisee's representative may peaceably seize and destroy the item without compensation or liability to Franchisee. Franchisee must also promptly correct any deficiency noted in a QSC report.

(19)   Franchisee will maintain Store business hours and days of operation in accordance with System standards, unless Company grants a written exception.

(20)   Franchisee will comply strictly with all federal, state and local laws and government regulations applicable to Franchisee's franchised business, including those relating to taxation, employment and promotion practices, employee wages, child and immigrant labor, disabled persons, workers' compensation, truth-in-advertising, occupational safety and health, and sanitation.

(21)   Franchisee will (i) adopt and follow Company's fiscal year for accounting purposes, (ii) adopt and follow the accounting principles, policies and practices Company prescribes, including use of Company's standard chart of accounts, (iii) acquire, install and use the Information Systems Company specifies from time to time in the Operations Manual, and implement and maintain an approved Payment Card Industry (PCI) compliance program Company specifies from time to time in the Operations Manual, (iv) install and continually maintain a telephone line for the Store's modem, and (v) furnish Company the modem's telephone number, as originally assigned and as changed from time to time.

(22)   Franchisee will accurately calculate and report Gross Sales to Company at the times and through the procedures Company from time to time specifies (including electronic means). Franchisee acknowledges that Company may electronically poll the Store's Information Systems to obtain Gross Sales data, as well as other financial and operating information. Franchisee agrees to maintain continual data network access to the Store's Information Systems for use by Company.

(23)   At Company's request, Franchisee will furnish Company copies of all federal and state income and sales tax returns filed by Franchisee with respect to the Store's income or sales.

(24)   Franchisee will permit Company, at any time during the term of the franchise and for three years after it expires or terminates, to conduct a special audit of Franchisee's books and records relating to the Store's operation. To assist Company in planning and conducting its audit program, Franchisee expressly authorizes Company to obtain from any vendor with which Franchisee does business copies of invoices and other sales data related to Franchisee's account with the vendor. If an audit establishes that Franchisee's royalty/marketing fee reports or profit and loss statements have understated Gross Sales for any fiscal year by more than 1%, Franchisee shall pay the audit's cost, including the travel, lodging and meal expenses of the persons who conduct the audit. Otherwise, Company will bear the audit's entire cost. Franchisee shall promptly pay Company any royalty and marketing fee deficiencies established by an audit, together with interest as provided in Section 14.

(25)   (i) Franchisee will maintain complete and accurate books and records relating to the operation of the Store in accordance with Section 7(d)(21), permit Company representatives to inspect such books and records at reasonable times and, within 45 days after the end of each fiscal year of the Store, submit to Company a balance sheet, income statement and statement of cash flow for the year then ended. These financial statements shall disclose separately the items specified by Company on forms it provides, and shall be prepared in accordance with the accounting principles and practices Company prescribes. If Franchisee is at any time required to furnish any lender, lessor, government agency or other person audited financial statements with respect to Franchisee's franchised business, Franchisee shall concurrently furnish Company a copy of such audited financial statements.

(26)   (i)   Franchisee will carry continuously during the term of the franchise insurance of the types (including worker's compensation and various special liability coverages), in the amounts and with the coverages the Operations Manual specifies from time to time. Until the Operations Manual specifies otherwise, Franchisee will carry general liability insurance with policy limits of $1,000,000 per occurrence and $2,000,000 aggregate, and with umbrella coverage of $2,000,000. Each

policy must (1) be obtained from an insurance carrier that has and maintains a Best's Insurance Reports rating of A, Class VIII, or better; (2) name Company as an additional insured and afford separate coverage to each named insured; (3) provide for a deductible of not more than $500 per occurrence; (4) contain no provision that limits or reduces Franchisee's coverage on account of a claim against Franchisee by Company; and (5) provide for not less than 30 days' prior notice to Company of cancellation or non-renewal.

(ii)    Franchisee shall furnish Company certificates of insurance to prove that such insurance coverage is in effect, both prior to the opening of the Store and within 10 days after each policy renewal date. If Franchisee fails to maintain the required insurance, Company may obtain coverage on Franchisee's behalf and charge the cost to Franchisee. Franchisee agrees to reimburse Company for the premium costs it incurs to provide such coverage, plus interest as provided in Section 14, within ten days after Company submits a statement for its costs.

(27)   (i)    Franchisee will indemnify, hold harmless and timely defend the Indemnified Parties from and against any and all claims, demands, legal proceedings, administrative inquiries, investigations and proceedings, damages, losses, judgments, settlements, fines, penalties, remedial actions, costs and expenses (including attorneys' fees) asserted against, incurred or sustained by any Indemnified Party, whether or not separately insured, that arise out of or are attributable to Franchisee's operation of the Store or the use of any Internet site or Intranet network Company develops.

(ii)    Company may elect (but under no circumstance will be obligated) to undertake or assume the defense of any such claim, demand, inquiry, investigation or proceeding (an "Indemnified Matter"), and to conduct and supervise all settlement negotiations related to any Indemnified Matter. Company will pay the legal fees and other expenses it incurs in connection with the investigation, defense and settlement of any Indemnified Matter it undertakes to defend or assumes. If a proposed settlement of any Indemnified Matter will result in an admission of liability or financial contribution by Franchisee, Company will not settle the Indemnified Matter without Franchisee's participation and concurrence. Otherwise, Company's election to undertake or assume the defense or settlement of an Indemnified Matter will in no way or circumstance extinguish or diminish Franchisee's obligation to indemnify and hold the Indemnified Parties harmless.

(28)   Franchisee will not, without Company's prior written consent, sell any interior or exterior sign bearing or representing any of the Marks, sell all or substantially all the Store's assets, or assign or sublease the Store's premises to any person or entity who has not agreed in accordance with Section 13 to continue operating a Kolache Factory Store in the premises.

(29)   Franchisee will send at least one approved representative to Company's annual Franchisee Seminar. To the extent Company does not allocate monies from the Ad Fund to cover all or a portion of attendance costs, Franchisee will be responsible for the costs for its representative to travel to and attend Company's annual Franchisee Seminar, including any attendance fee charged by Company year to year. Franchisee may send additional representatives to the Franchisee Seminar at its sole cost.

**8.    Advertising and Promotions.**

(a)    **Ad Fund.**

(1)    Company has established a separate and segregated advertising fund ("Ad Fund") that it administers for the purpose of enhancing the goodwill and public image of the Kolache Factory Network through advertising and promotions. All franchised Stores (but not Company-operated Stores) are obligated to make contributions to the Ad Fund. Franchisee agrees to make contributions to

the Ad Fund in the manner (including payment by automatic debit), and at the rate Company establishes. Company may not establish an Ad Fund contribution rate in excess of 3% of annual Gross Sales.

(2)     Company will use the Ad Fund (i) to create marketing materials relating to the Kolache Factory Network and the products Stores sell, (ii) to place and run advertisements, commercials and promotional materials in local, regional and national media, (iii) to pay for public relations projects intended to enhance the goodwill and public image of the Kolache Factory Network, (iv) to cover a portion of the costs for our annual Franchisee Seminar, and (v) to reimburse Company or its affiliates (based on reasonable allocations calculated by Company's management) (a) for salaries and other overhead expenses that are directly related to projects of a character described in clauses (i), (ii) and (iii), and (b) for part of the cost of maintaining the Kolache Factory Website, as authorized in Section 9(a)(3). However, Company may not use Ad Fund contributions to pay for those components of the Website that publicize the Kolache Factory franchise program or the sale of Kolache Factory franchises.

(3)     Company will furnish Franchisee Company-generated advertising and promotional materials that Franchisee has paid for with Ad Fund contributions. Franchisee must pay to publish or run advertising materials in any local media that Franchisee pursues independently of the Ad Fund including, but not limited to, newspapers, magazines, direct mailers, radio and television. Franchisee will not alter or reproduce any Company generated advertising or promotional materials without the express consent of the Company, and may not create, distribute or publish non-Company generated advertising and promotional materials without the express consent of the Company.

(4)     Company will use Ad Fund contributions in a manner that provides marketing benefits to all Stores. However, Company reserves the right to allocate Ad Fund contributions to various permitted uses as it sees fit. To the greatest extent feasible, Company will strive to spend Ad Fund contributions in a manner that provides advertising benefits to all participating Stores. However, Company does not guarantee that all Stores will receive identical media exposure or equal advertising benefits in view of regional differences in media costs, varying degrees of market penetration in different DMAs and other relevant factors.

(5)     Company reserves the right to structure the Ad Fund's organization and administration in ways that, in Company's judgment, most effectively and efficiently accomplish the Ad Fund's objectives. Company may therefore organize or reorganize the Ad Fund as a separate non-profit corporation or other appropriate entity and transfer the Ad Fund's assets to the entity. If Company establishes a separate entity to administer the Ad Fund, Franchisee agrees to become a member of the entity and, in that regard, to sign a participation agreement and take such other steps as Company reasonably specifies.

(b)     **Local Advertising**.

(1)     Franchisee will prepare and implement an annual local advertising plan and provide a copy to Company within 30 days before the end of the previous year. Franchisee must spend at least 3% of Gross Sales to advertise and promote the Store locally.

(2)     Franchisee agrees to participate in all system-wide promotions Company originates and mandates. A portion of the costs associated with the development of these system-wide advertising and promotions programs will be deducted from the Ad Fund. Franchisee will initially have discretion over the allocation of local media dollars (money used to purchase advertising space) that are applied against the Ad Fund, but agrees to use only Company generated advertising and promotional materials which may include, but are not limited to, print ads, radio/TV commercials, flyers and point-of-sale materials. Franchisee discretion over the allocation of local media dollars will continue until an Area Cooperative has been established in the Store's DMA under Section 8(c). Franchisee will not

create, distribute, publish or broadcast any advertising or promotional materials not provided by Company without the express consent of Company. As outlined in Section 12(a)(6), Company reserves the right to approve in advance Franchisee's use of graphic, print or broadcast materials developed by Franchisee that feature any of the Marks.

(3)     Within 30 days after the end of each fiscal quarter, Franchisee shall submit a Local Area Marketing ("LAM") Report to Company on a form Company provides. Each LAM Report shall show the amount Franchisee spent for local advertising and promotions during the preceding quarter and the way Franchisee spent those funds. Upon Company's request, Franchisee shall also submit documents substantiating that Franchisee incurred and paid particular expenditures during the quarter.

(c)     **Area Cooperatives**.

(1)     At the time the DMA in which the Store is located encompasses Stores operated by at least two owners, the owners in the DMA will, at Company's request and with its advice and assistance, form a cooperative advertising association among themselves (an "Area Cooperative") for the purpose of jointly advertising and promoting their Stores.

(2)     If, in connection with an Area Cooperative's formation or functioning, its members are unable to reach agreement with respect to any disagreement over organization, administration, "spill" policy, contribution waivers or exceptions, budget or other matters that the members cannot resolve within 45 days, the issue will be referred to Company for resolution. Company's decision with respect to the issue's resolution will be binding on all members of the Area Cooperative. In addition, Company reserves the right to review each Area Cooperative's contribution rate on an annual basis and to disapprove a rate of less than 1% of Gross Sales.

(3)     Franchisee agrees (i) to join, participate in, and actively support any Area Cooperative established in the Store's DMA, and (ii) to make contributions to each Area Cooperative on the payment schedule adopted by the Area Cooperative's members and at the contribution rate approved by Company.

## 9.     Concerning the Internet.

(a)     **Internet Website.**

(1)     Company has established and plans to maintain an Internet Website that provides information about the Kolache Factory concept and the products and services that Stores offer. Company will have sole discretion and control over the Website's design and contents. Company will have no obligation to maintain the Website indefinitely, but may dismantle it at any time without liability to Franchisee.

(2)     The Website will include a series of interior pages that identify participating Stores by name, address, telephone number and e-mail address. Franchisee will not have the capability to modify its page(s).

(3)     Franchisee agrees to contribute a reasonable amount toward the cost of the Website's maintenance and further development, which amount may not exceed $50 per month. Company will set the contribution amount in March of each year, and Franchisee will pay one quarter of its annual contribution quarterly within 30 days after Company sends Franchisee an invoice for the contribution. Any balance of a quarterly payment that remains unpaid 30 days after the invoice date will bear interest from that date until paid at the rate of 18% per annum (or, if less, the highest rate permitted

by applicable law). In addition or alternatively, Company may use part of the Ad Fund contributions that Company collects under Section 8(a) to maintain and further develop the Website.

(4)     If Franchisee fails to pay when due any fees or other amounts payable to Company under this Agreement, Company may temporarily disable Franchisee's Web page(s) until such time as Franchisee pays its outstanding obligation in full.

(5)     Franchisee will have no right, license or authority to use any of the Marks on or in connection with the Internet, except as stated in and permitted by this Section 9(a).

(b)     **Kolache Factory Intranet.**

(1)     Company may, at its option, establish and maintain a so-called Intranet through which members of the Kolache Factory network of Stores may communicate with each other and through which Company may disseminate electronic updates to the Operations Manual and other confidential information. Company will have no obligation to maintain the Intranet indefinitely, but may dismantle it at any time without liability to Franchisee.

(2)     Company will establish policies and procedures for the Intranet's use. These policies, procedures and other terms of use will address issues such as (a) restrictions on the use of abusive, slanderous or otherwise offensive language in electronic communications; (b) restrictions on communications between or among Franchisees that endorse or encourage breach of any Franchisee's Franchise Agreement; (c) confidential treatment of materials that Company transmits via the Intranet; (d) password protocols and other security precautions; (e) grounds and procedures for Company's suspending or revoking a Franchisee's access to the Intranet; and (f) a privacy policy governing Company's access to and use of electronic communications that franchisees post on the Intranet. Company expects to adopt and adhere to a reasonable privacy policy. However, Franchisee acknowledges that, as administrator of the Intranet, Company can technically access and view any communication that any person posts on the Intranet. Franchisee further acknowledges that the Intranet facility and all communications that are posted to it will become Company's property, free of any claims of privacy or privilege that Franchisee or any other person may assert.

(3)     Franchisee agrees to purchase and install all necessary additions to the Store's Information System and to establish and continually maintain electronic connection with the Intranet that allows Company to send messages to and receive messages from Franchisee. Franchisee's obligation to maintain connection with the Intranet will continue until the Franchise Agreement's expiration or termination (or, if earlier, until Company dismantles the Intranet).

(4)     Franchisee agrees to contribute a reasonable amount, not to exceed $50 per month, toward the cost of the Intranet's maintenance and further development. Company will set the contribution amount in March of each year and Franchisee will pay one quarter of its annual contribution quarterly within 30 days after Company sends Franchisee an invoice for the contribution. Any balance of a quarterly payment that remains unpaid 30 days after the invoice date will bear interest from that date until paid at the rate of 18% per annum (or, if less, the highest rate permitted by applicable law).

(5)     If Franchisee fails to pay when due any amount payable to Company under the Franchise Agreement, or if Franchisee fails to comply with any policy or procedure governing the Intranet, Company may temporarily suspend Franchisee's access to any so called chat room, bulletin board, list serve or similar feature the Intranet includes until such time as Franchisee fully cures the breach.

(c)     **Social Media**. Company has sole discretion and control over any profiles using or relating to the Marks, or that display the Marks, that are maintained on social media outlets, including without limitation MySpace, Facebook and Twitter or other similar outlets that may exist in the future. Company may use part of the Ad Fund monies it collects under this Agreement to pay or reimburse the costs associated with the development, maintenance and update of such profiles. Company may (but need not) establish guidelines pursuant to which Franchisee may establish profiles or otherwise establish a presence on such social media outlets. In that event, Franchisee shall comply with the standards, protocols and restrictions that Company imposes from time to time on such use.

10.     **Royalties.**

(a)     In consideration for Franchisee's continuing use of the Marks and the System, Franchisee agrees to pay Company continuing royalties equal to 5% of Gross Sales.

(b)     Royalties (and Ad Fund contributions under Section 8(a)) will be payable weekly by automatic debit of Franchisee's account. Franchisee will authorize Company and its bank to debit Franchisee's account directly by signing and delivering an Authorization Agreement for Preauthorized Payments in the form attached to this Agreement as Exhibit E. Royalties will be payable without notice or demand on Monday of each week with respect to Franchisee's Gross Sales for the week ending the preceding Saturday. By notice in writing to all franchisees, Company may from time to time change the payment interval, the payment date, and/or the manner of payment.

(c)     Franchisee will not be entitled to withhold payment of royalties on account of Company's breach or alleged breach of its obligations under this Agreement; Company's performance under this Agreement constitutes no part of the consideration for Franchisee's obligation to pay royalties.

11.     **Term and Renewal.**

(a)     The franchise will continue for a primary term of 10 years from and after the Effective Date, subject to earlier termination in accordance with Sections 16 and 17.

(b)     If, upon the expiration of the 10-year primary term, Franchisee is in full compliance with Franchisee's agreements and obligations under this Agreement, Franchisee shall have the option to renew the franchise for two additional terms of five years each by (1) notifying Company of Franchisee's intention to renew not earlier than 180 days nor later than 120 days before the primary term's scheduled expiration date, (2) signing Company's then current renewal form of Franchise Agreement (which will define Franchisee's subsequent renewal rights), (3) not later than 30 days before the primary term's scheduled expiration date, completing the remodeling, refurbishing and modernizing of the Store's interior and exterior, including its furniture, fixtures, signs, equipment, Information Systems and Trade Dress, to conform to the standards Company then stipulates, and (4) not later than the first day of the renewal term, Franchisee delivers to Company an unconditional, general release of all claims Franchisee may have against Company and its affiliates..

(c)     Franchisee's failure or refusal to comply with any of the four conditions to renewal stated in Section 11(b), each of which Franchisee acknowledges to be reasonable and material, will be interpreted as a conclusive, irrevocable election on Franchisee's part not to renew the term of the franchise.

(d)     The relationship between Company and Franchisee during the renewal period will be governed by the provisions of Company's then current renewal form of Franchise Agreement, including those pertaining to royalties, advertising, competitive protection and concept modifications. Whether or not Franchisee actually signs a then current renewal form of Franchise Agreement, Franchisee will be

conclusively presumed to have assented to and to have agreed to be bound by its terms by continuing to operate the Store for one day past the primary term's expiration date.

(e)     If Franchisee does not qualify to renew, or elects not to renew, the franchise, Company will permit Franchisee to transfer the franchise to a qualified purchaser in accordance with Section 13. If, in the exercise of diligent, good faith efforts by Franchisee, the transfer cannot be completed before the franchise's scheduled expiration date, Company may, in its sole discretion, extend the franchise's term from month-to-month for so long as Company believes that Franchisee is continuing to make a conscientious effort to negotiate and complete a transfer. If Company allows Franchisee to extend in order to complete a transfer, Franchisee will operate the Store during the interim period in accordance with Company's then current form of Franchise Agreement.

(f)     If Franchisee does not qualify to renew, or elects not to renew, the franchise and it therefore expires, immediately after expiration, Franchisee must comply with the requirements of Section 17(a), and Company will have the rights and remedies provided in Sections 17(a) through 17(j).

## 12. Use of Intellectual Property.

(a)     **Marks and Copyrighted Materials**. Franchisee acknowledges that Company is authorized by law to prevent the unauthorized use of the Marks, to control the quality of goods and services associated with the Marks, and to control the copying and distribution of the Copyrighted Materials. Recognizing the importance to Company and other members of the Kolache Factory Network of the protection and preservation of the Marks and Copyrighted Materials, Franchisee agrees to perform and abide by the following provisions:

(1)     Franchisee acknowledges that Company is the lawful and rightful owner of each and all of the Marks and the Copyrighted Materials, that Franchisee's interest in the Marks and the Copyrighted Materials is solely that of a licensee, and that all uses of the Marks and the Copyrighted Materials by Franchisee will be attributed to Company for purposes of trademark and copyright law. Franchisee unconditionally disclaims any ownership interest in any of the Marks and the Copyrighted Materials.

(2)     Franchisee shall not use "Kolache", "Kolache Factory" or any abbreviation, acronym or variation of those words as part of its name or as part of the name of any Business Entity in which Franchisee owns or holds an interest. However, Franchisee may, if required by law, file an assumed name or fictitious name certificate to the effect that Franchisee is operating the Store under a trade name that includes the Kolache Factory service mark.

(3)     Franchisee shall not use any of the Marks or the Copyrighted Materials in connection with the advertisement, promotion, sale or distribution of any menu item not listed on Company's approved menu, any merchandise not listed in Company's authorized Store merchandise list, or any service not customarily offered by Stores. Specifically, Franchisee shall not use menus, guest checks, carry-out containers, discount coupons, labels or other materials bearing the Kolache Factory trademark, service mark or logo to advertise, promote, sell or distribute any unapproved merchandise, product or service.

(4)     Franchisee shall not copy, distribute or otherwise disseminate any of the Copyrighted Materials in violation of the restrictions and limitations imposed by this Agreement.

(5)     Franchisee shall not use any of the Marks or the Copyrighted Materials in connection with the development or operation of any Store (except the one covered by this Agreement) until Company and Franchisee have both signed a Franchise Agreement for the additional Store, or of

any Special Outlet until Company has given Franchisee written authorization to install and operate the Special Outlet.

(6)     Franchisee shall (i) adopt and use all additional trade names, trademarks, brand names, copyrighted materials, slogans, commercial symbols and logos Company develops from time to time, (ii) use all the Marks in the precise form Company prescribes, and (iii) observe Company directions regarding the use, copying and distribution of the Copyrighted Materials, the presentation of the Marks and the manner of the Marks' display and use. Franchisee shall promptly abandon and discontinue the use of any Mark or Copyrighted Materials that Company judges to be obsolete or no longer characteristic of the image Stores should project. Franchisee shall submit to Company all paper goods, advertisements and promotional materials not furnished by Company for its approval prior to use.

(7)     Franchisee shall not use any of the Marks on any goods and/or for any services otherwise than in compliance with specifications Company issues from time to time, and with such other quality control measures that Company may adopt to promote and defend the goodwill associated with the Marks.

(8)     Franchisee shall not knowingly permit, and shall promptly report to Company, any apparently unauthorized use of a Mark and any apparently unauthorized use or copying of any Copyrighted Materials by any person, or the use by any person of a trade name, trademark, service mark or symbol that might be construed as an infringement of any Mark or as unfair competition or passing-off at common law, and shall actively cooperate with the Company in the investigation of infringement claims and in discovery and trial proceedings related to infringement actions. Company reserves the right to make the final determination of infringement or other unlawful use, to conduct all legal proceedings relating to the Marks and the Copyrighted Materials, and to compromise or settle all infringement claims.

(9)     At no time shall Franchisee make any written or oral admission that a Mark or any of Company's copyrights is in any way invalid or infringes the rights of any person or is open to any other form of attack, but shall promptly notify Company of any allegation of invalidity or infringement of which Franchisee becomes aware. Company intends to defend its rights in the Marks and the Copyrighted Materials vigorously, but does not warrant to Franchisee that Company's ownership of any of them is incontestable or that they do not infringe or conflict with the rights of any third party.

(10)    Upon the expiration or termination of the franchise, Franchisee shall immediately discontinue all further uses of the Marks and Copyrighted Materials and shall take appropriate action to remove the Marks from the premises in which the Store is located, to cancel any advertising relating to Franchisee's use of the Marks or the Copyrighted Materials, including yellow pages listings, and to cancel or withdraw any assumed or fictitious name filings covering Franchisee's use of Company's trade name. Franchisee acknowledges and agrees that failure or refusal to comply fully with these requirements will constitute willful trademark and copyright infringement.

(b)     **The System, Trade Secrets and Operations Manual**.  Franchisee acknowledges that the System and the Trade Secrets belong exclusively to Company and that the ideas and information in the Operations Manual are Company's sole and exclusive property. Franchisee further acknowledges that the unauthorized disclosure or use of any confidential element of the System, any Trade Secret or any other information the Operations Manual contains may adversely affect the business, competitive position and goodwill of Company and its franchisees. Accordingly, Franchisee agrees to perform and abide by the following provisions and restrictions, each of which shall survive the expiration or termination of this Agreement and shall be perpetually binding upon Franchisee.

(1)     Franchisee shall hold the elements of the System, the Trade Secrets and the contents of the Operations Manual in strict confidence, shall not disclose any Trade Secret or any

operating or management procedure to any person or business entity other than Franchisee's General Manager and bona fide employees of the Store to whom such disclosure is necessary in relation to their job duties, and shall instruct and routinely remind Franchisee's employees that the System, the Trade Secrets and the contents of the Operations Manual are confidential and may not be disclosed or appropriated. If Franchisee is a corporation, it will not disclose any element of the System, any of the Trade Secrets or the contents of the Operations Manual, or make the Operations Manual available, to any shareholder, director or officer of Franchisee other than its General Manager and other senior executive officers, if any, who are actively and regularly involved in the Store's management.  If Franchisee is a partnership or limited liability company, it will not disclose any element of the System, any of the Trade Secrets or the contents of the Operations Manual, or make the Operations Manual available, to any general or limited partner or to any member of Franchisee other than its General Manager and other general partners and equity owners, if any, who are actively and regularly involved in the Store's management.

(2)      Franchisee shall not use any element of the System, any of the Trade Secrets or the operating, management or marketing procedures the Operations Manual contains in connection with the operation of any establishment or enterprise other than the Store, and shall promptly discontinue use of the System, the Trade Secrets and the operating, management and marketing procedures the Operations Manual contains upon the expiration or termination of the franchise.

(3)      Franchisee shall not, without Company's prior written consent, copy or permit any person to copy or reproduce any part of the Operations Manual and any other printed, graphic or audio/visual item designated by Company as containing Trade Secrets or otherwise permit their use or inspection by any person other than Franchisee, the General Manager, bona fide employees of the Store to whom such disclosure is necessary in relation to their job duties, and authorized Company representatives.

(4)      Franchisee acknowledges and agrees that the electronic version of the Operations Manual on display on Company's Intranet from time to time constitutes the standard, official version for purposes of resolving any question or dispute concerning the Operations Manual's contents.

(5)      Franchisee shall obtain from each of Franchisee's General Managers, supervisors and managerial level employees of the Store a confidentiality agreement and non-compete agreement that is valid and enforceable under the laws of the state in which the Store operates and that imposes the restrictions and limitations of this Section 12(b) on each such individual for the longest period applicable law permits. Each confidentiality agreement shall designate Company as a third party beneficiary and shall entitle Company to enforce its provisions directly against the signatory General Manager, supervisor or manager.

(6)      Franchisee shall keep the Operations Manual and any other electronic, web-based, printed, graphic or other audio/visual item designated by Company as containing Trade Secrets in the Store at all times and shall promptly return them to Company upon the expiration or termination of the franchise.

(7)      Franchisee expressly acknowledges that all employee training materials (including video cassettes and CD-ROM disks) and all computer programs developed by Company or in accordance with its specifications contain information, embody procedures or facilitate business practices that are proprietary to Company and fall within the parameters of its Trade Secrets.

(c)     **Internet Domain Name and Intranet Network.**

(1)     Franchisee acknowledges that Company is the lawful, rightful and sole owner of the     www.kolachefactory.com,     www.kolachefactory.org,     www.kolachefactory.net     and www.kolachefactoryto_go.com domain names, and unconditionally disclaims any ownership interest in those or any colorably similar Internet domain names. Franchisee agrees not to register any Internet domain name in any class or category that contains the words Kolache, Kolache Factory or any abbreviation, acronym or variation of those words.

(2)     If and when Company develops an Intranet network through which Company and its franchisees can communicate by e-mail or similar electronic means, Franchisee agrees to use the facilities of the Kolache Factory Intranet in strict compliance with the standards, protocols and restrictions Company includes in the Operations Manual. Franchisee especially recognizes the crucial importance of a user's not transmitting confidential information, documents or data via the Kolache Factory Intranet without first encrypting the transmission with the encryption program Company adopts. Franchisee also recognizes the importance of a user's refraining from making derogatory, defamatory or libelous statements in an Intranet transmission.

13.     **Transfers.**

(a)     **Limitations on Transfer.**  Franchisee acknowledges that the integrity of the System and the stability of the Kolache Factory Network depend on the business qualifications, financial capabilities, honesty and integrity of Company's franchisees. Franchisee further acknowledges that Company's lack of opportunity to evaluate and approve each potential franchisee's qualifications and the terms of each proposed transfer could irreparably damage the Kolache Factory Network. Consequently, Franchisee agrees not to sell, assign, transfer, give away, pledge, mortgage or otherwise dispose of any interest in the Store, the franchise or Franchisee's rights under this Agreement without Company's prior written consent. If Franchisee is a Business Entity, any sale, transfer or other disposition of any equity interest in Franchisee (except a limited partnership interest) shall be considered a transfer covered by and subject to the terms and conditions of this Section 12. Any transfer lacking Company's prior written consent or that otherwise violates the restrictions in this Section 12 will be ineffective against Company and will constitute a default under Section 16(c)(2).

(b)     **Conditions to Voluntary Transfer of Rights.**  Franchisee may not assign or transfer the franchise before the Store opens for business under any circumstances except those described in Section 13(f). After the Store opens, Company's consent to a voluntary disposition of Franchisee's interest in the franchise or under this Agreement will not be unreasonably withheld, provided that:

(1)     At the time of transfer, Franchisee is in full compliance with Franchisee's obligations under this Agreement, including payment of all monetary obligations due Company.

(2)     The proposed transfer or other disposition involves the complete disposition of the franchise, and Franchisee relinquishes the franchise and related rights under this Agreement in writing.

(3)     Franchisee returns the Operations Manual and all Copyrighted Materials to Company.

(4)     The transferee meets Company's standards for qualifying as a new Store Franchisee.

(5)    Franchisee furnishes Company a copy of the contract of sale, including price and payment terms, and Company, in its sole discretion, determines that the transferee will be able to satisfy any debt obligations to Franchisee and still derive a reasonable profit from the Store's operation.

(6)    The transferee provides Company pro forma profit and loss and cash flow projections for the 24 months following the transfer (including provision for principal and interest on any obligations payments to Franchisee). These projections must demonstrate to Company's reasonable satisfaction that the transferee can operate the Store without experiencing a loss or negative cash flow. If these projections, as adjusted to take into account factors Company points out, indicate that the transferee may experience a loss or negative cash flow, but Franchisee and the transferee prevail upon Company to approve the transfer anyway, the transferee must waive any claims against Company related to Company's approval of an economically questionable transaction.

(7)    The transferee executes then current forms of Franchise Agreement (which will limit the term of the transferee's franchise to the unexpired term of Franchisee's franchise), Assignment of Telephone Numbers, Authorization Agreement for Preauthorized Payments, and other collateral agreements Company may then require.

(8)    The transferee provides Company a waiver and release with respect to liability for any financial data, earnings claims, representations and other information Franchisee or its representatives provided the transferee.

(9)    Each general partner or holder of 15% or more of the transferee's equity executes a Guaranty and Acknowledgment (a "Guaranty") in the form appended to this Agreement.

(10)    The transferee and the transferee's General Manager satisfactorily complete Company's training program.

(11)    Company receives a $6,000 transfer fee from either the transferor or the transferee.

(12)    If Company agrees to release Franchisee or any other person from further liability under this Agreement or under a Guaranty, Franchisee and each such other person must also give Company an unconditional, general release of all claims they may have against Company and its affiliates.

(c)    **Involuntary Transfers**. No involuntary transfer or partitioning of Franchisee's interest in the franchise or under this Agreement, whether in connection with a bankruptcy, foreclosure, divorce or other proceeding, will be effective against Company unless and until the transferee (1) furnishes Company a signed Guaranty under which the transferee agrees to be jointly and severally liable for the payment of Franchisee's monetary obligations under this Agreement, whether or not such obligations are then delinquent, (2) agrees in writing to be personally bound by the confidentiality provisions and restrictive covenants in this Agreement, and (3) unless the transfer encompasses Franchisee's total interest in the franchise and under this Agreement, irrevocably designates and appoints Franchisee to be the transferee's agent and attorney-in-fact with whom Company may deal for all purposes expressed in or contemplated by this Agreement.

(d)    **Conditions to Equity Transfer**. Company will not permit the transfer of an equity interest in a corporate, partnership or limited liability company franchisee before the Store opens for business under any circumstances except those described in Section 13(f). After the Store opens, Company's consent to a voluntary or involuntary sale, assignment or transfer of an equity interest in a franchisee that is a Business Entity will not be unreasonably withheld, provided that:

(1) At the time of transfer, Franchisee is in full compliance with its obligations under this Agreement, including payment of all monetary obligations due Company.

(2) Each proposed transferee of a general partnership interest in a partnership Franchisee and each proposed transferee of a 15% or greater interest in a corporate or limited liability company Franchisee's equity meets Company's standards for qualifying as a new Store Franchisee and delivers a signed Guaranty to Company.

(3) If the transfer involves 50% or more of the equity interest in Franchisee, the transferees comply with Sections 13(b)(5), 13(b)(6), 13(b)(8), 13(b)(9) and 13(b)(10).

(4) If Company agrees to release Franchisee from further liability under this Agreement or its owners from further liability under a Guaranty, Franchisee and each of its owners must also give Company an unconditional, general release of all claims they may have against Company and its affiliates.

(e) **Waiver of Interference Claims**. Franchisee acknowledges that Company has legitimate reasons to evaluate the qualifications of potential transferees and to analyze and critique the terms of their purchase contracts with Franchisee. Franchisee also acknowledges that Company's contact with potential transferees for the purpose of protecting its business interests will not constitute improper or unlawful conduct. Franchisee expressly authorizes Company to investigate any potential transferee's qualifications, to analyze and critique the proposed purchase terms with the transferee, and to withhold consent to economically questionable transactions. Franchisee waives any claim that action Company takes in relation to a proposed transfer to protect its business interests constitutes tortuous interference with contractual or business relationships.

(f) **Special Transfers**.

(1) If Franchisee is an individual or married couple who at any time advises Company that Franchisee wants to assign the franchise to a Business Entity in which Franchisee will own a 100% voting equity interest, Company will consent to the assignment and waive payment of a transfer fee and its right of first refusal under Section 13(g) upon its receipt of such documentation and information concerning the Business Entity and its equity owners as Company may reasonably request. The required documentation will include, without limitation, (i) a certified list of the Business Entity's stockholders, partners, members or other beneficial owners (designating the amount and percentage of stock or units of beneficial ownership each equity owner owns), (ii) a Guaranty signed by each holder of 15% or more of the Business Entity's equity securities, and (iii) an express assumption by the Business Entity of Franchisee's obligations under this Agreement.

(2) If Franchisee is a Business Entity, Company will consent to assignments and transfers of ownership interests among Franchisee's original investors and waive payment of a transfer fee and its right of first refusal under Section 13(g) upon its receipt of such documentation and information concerning the assignment or transfer and the resulting ownership of Franchisee as Company may reasonably request. The required documentation will include, without limitation, a Guaranty signed by each holder of 15% or more of a Business Entity Franchisee's stock or units of beneficial ownership who has not previously signed a Guaranty. If Company agrees to release any retiring investor from further liability under a Guaranty, the retiring investor must also give Company an unconditional, general release of any claims the investor may have against Company.

(3) If Franchisee is an individual, Franchisee may effect a transfer under Section 13(f)(1) and simultaneously or later transfer a cumulative total of not more than 49% of the Business

Unofficial Copy Office of Chris Daniel District Clerk

Entity's capital stock or units of beneficial ownership to any combination of Franchisee's spouse, natural or adopted children or an inter vivos (lifetime) trust created for the benefit of Franchisee's spouse and/or children. Company will consent to the transfer and waive payment of a transfer fee and its right of first refusal under Section 13(f) upon its receipt of such documentation and information concerning the transfer and the resulting ownership of the Business Entity's stock or units of beneficial ownership as Company may reasonably request. The required documentation will include, without limitation, (i) a certified list of the Business Entity's equity owners (designating the amount and percentage of stock or units of beneficial ownership each equity owner owns), and (ii) a Guaranty signed by each holder of 15% or more of the Business Entity's equity who has not previously signed a Guaranty.

(4) If Franchisee is a Business Entity, each of Franchisee's equity owners may transfer a cumulative total of not more than 49% of his or her ownership interest in Franchisee to any combination of the person's spouse, natural or adopted children or an inter vivos trust created for the benefit of the person's spouse and/or children. Company will consent to the transfer and waive payment of a transfer fee and its right of first refusal under Section 13(g) upon its receipt of such documentation and information concerning the transfer and the resulting ownership of Franchisee as Company may reasonably request. The required documentation will include, without limitation, (i) a certified list of the Franchisee's equity owners (designating the amount and percentage of stock or units of beneficial ownership each person owns), and (ii) a Guaranty signed by each holder of 15% or more of Franchisee's equity who has not previously signed a Guaranty.

(g) **Right of First Refusal**. Notwithstanding Sections 13(b), 13(c) or 13(d), Franchisee may not voluntarily or involuntarily transfer or otherwise dispose of any interest in the franchise or permit the sale, assignment or transfer of a controlling equity interest in Franchisee without first offering in writing to sell the interest to Company upon the terms and conditions, including price and payment terms, that are recited in a bona fide written offer the proposed seller obtains. Franchisee must furnish Company with a copy of the written offer, together with (1) a recent balance sheet of the Store (or of Franchisee if it is a Business Entity), (2) copies of Franchisee's building and equipment leases, (3) a schedule of notes and trade accounts then payable by Franchisee, and (4) copies of any other information that Franchisee or the proposed seller furnishes to the offeror. Company shall have 30 days following its receipt of Franchisee's written offer and related information to accept or reject it, and at least 30 additional days to consummate the purchase.

(h) **Purchase Upon Franchisee's Death or Disability**.

(1) This Section 13(h) applies only if (i) an individual Franchisee, a general partner owning a 50% or greater profits interest in a partnership Franchisee, or a beneficial owner owning 50% or more of the outstanding capital stock or units of beneficial ownership of a corporate or limited liability company Franchisee dies or becomes disabled during the term of the franchise, and (ii) the death or disability results in a change in executive-level responsibility for managing the franchised business.

(2) During the first 120 days after the death or disability occurs, Company will evaluate the new management's willingness and ability to operate the Store in compliance with this Agreement. By the end of the 120-day evaluation period, Company will decide whether the new management is qualified to manage the Store and will notify management of its decision. As conditions to continuing the franchise relationship, each new proprietor, general partner or beneficial owner of 15% or more of Franchisee's equity must furnish Company a signed Guaranty, and any deficiency in Franchisee's compliance with the requirements of this Agreement must be cured. Further, Company may require the new management to attend and satisfactorily complete the training program provided under Section 6(a)(3).

(3)     If any of the conditions stated in Section 13(h)(2) are not satisfied, or if Company decides that the new management has not adequately demonstrated its business qualifications or commitment to the franchise relationship, the owners of the franchise will have 120 days after delivery of Company's notice to sign a binding contract to sell the franchise to a buyer approved by Company in accordance with, and in a transaction structured to comply with, Section 13(b) or 13(d), whichever is applicable. The proposed sale will be subject to Company's right of first refusal under Section 13(g).

(4)     If any of the franchise's owners fail to sign a binding contract of sale before the 120-day selling period expires, or (i) if a contract is signed, but the proposed sale is not concluded within 30 days after Company relinquishes its option under Section 13(g), Company will have an additional option during the next 30 days to purchase the interest in the franchise or in the Franchisee the deceased or disabled person held at the date of death or disability. The purchase price for the interest will be its fair market value, determined through negotiations or by appraisal. Unless otherwise agreed by the parties, the purchase price will be payable in cash at closing. If Company delivers written notice of its intention to exercise the option within the 30-day period, the option will be considered effectively exercised whether or not the purchase is actually consummated within the 30-day period.

(5)     If the parties fail to agree on a purchase price for the interest within 21 days after delivery of Company's notice, the issue will be submitted as promptly as possible to a group of three appraisers who are experienced in valuing similar franchises, one of whom will be selected by Company, another by the decedent's estate, and the third by the first two appraisers. All parties agree to submit to such appraisal proceedings, to be bound by the decision of a majority of the appraisers and to share payment of the appraisers' fees and expenses equally.

(i)     **Assignment by Company.**  Company may assign this Agreement and its rights and obligations as franchisor of the Kolache Factory Network to any assignee who, in Company's sole judgment and discretion, is capable of performing Company's obligations under this Agreement in a reasonably competent manner. Nothing in this Agreement will be interpreted to place any restrictions on the issuance, sale or transfer of any shares of Company's capital stock.

## 14.     Interest on Delinquent Accounts.

If Franchisee fails to make any royalty, marketing fee, Ad Fund contribution or trade account payment to Company within five business days after it is due, the amount payable will bear interest from the date it became due through the date of payment at the lesser of (i) 18% per annum, or (ii) the highest lawful rate of interest permitted by applicable Texas and federal law. Nothing in this Agreement shall obligate Franchisee or any guarantor of Franchisee's obligations to pay, or entitle Company to collect, interest in excess of the maximum rate applicable law permits. If, for any reason, Company charges or receives interest in excess of the maximum rate permitted by applicable law, the excess shall be applied as a payment against the principal amount of Franchisee's other obligations under this Agreement. If no other obligations are due, Company shall promptly refund the excess payment to the party that paid it.

## 15.     Store Relocation.

(a)     If the lease for the Store expires or is terminated before the end of the franchise's term, Franchisee may move the Store to another location chosen in accordance with the site selection procedure outlined in Sections 6(a) and 7(b). The new location (i) must be in the original Store's general trade area (as determined by Company in its sole judgment), and (ii) may in no case infringe another Store's protected Trade Area. When Company approves the location for the new Store, Company will prepare a new Summary Page that shows the street address of the new Store and a new Exhibit B that describes the new Store's Trade Area. The new Summary Page and Exhibit B will replace the original

Summary Page and Exhibit B for all purposes of this Agreement, including that of identifying the area in which Franchisee will enjoy competitive protection pursuant to Section 4.

(b)     If Franchisee loses possession of the original Store's premises because the lease expired by its terms, or on account of condemnation or eminent domain proceedings, or as the result of a default termination, Franchisee must initiate the relocation procedure in time to lease, build-out and open the new Store for business within 60 days after the original Store closes. If Franchisee's lease is terminated on account of a fire or other casualty, Franchisee must initiate the relocation procedure in time to lease, build-out and open the new Store for business within 120 days after the lease for the original Store terminates.

## 16.     Default.

(a)     If any event or condition listed in this Section 16 (an "Event of Default") occurs, Franchisee will be in default under this Agreement; the occurrence of an Event of Default is not predicated on notice of default by Company. Company's failure to take prompt action with respect to a particular Event of Default will not constitute a waiver of that or any subsequent Event of Default.

(b)     Following are Events of Default that Franchisee (or another responsible party) may cure by taking appropriate remedial action within a prescribed time after Company demands remedial action. Unless Franchisee (or another responsible party) cures such an Event of Default before the end of the indicated remedial period, Company may terminate the franchise or take any of the other actions Section 17 permits. If the Event of Default is cured to Company's satisfaction before Company gives Franchisee notice of termination, Company will not proceed under Section 17.

(1)     Franchisee fails to locate and either lease or purchase an approved site for the Store within six months after the Effective Date, and neither Company nor Franchisee terminates the franchise within the following 30 days. REMEDY – Franchisee must complete the site selections procedures and obtain lawful possession of an approved site within 30 days after written notice from Company.

(2)     Franchisee fails to construct and open the Store in compliance with Sections 7(c) or 7(d)(5), or to complete Company's training program in accordance with Section 7(d)(3). REMEDY - Franchisee must complete any unfulfilled requirement within 15 days after Company notifies Franchisee in writing of the action to be taken.

(3)     Franchisee fails to fulfill any requirement, to perform any obligation, or to observe any restriction set forth in Sections 5, 7(a), 7(d)(1), 7(d)(2), 7(d)(4), 7(d)(6) through 7(d)(9), 7(d)(11) through 7(d)(14), 7(d)(16), 7(d)(17), 7(d)(19) through 7(d)(21), 7(d)(25) or 7(d)(26). REMEDY - Franchisee must correct any element of noncompliance within 30 days after Company notifies Franchisee in writing of the remedial action to be taken.

(4)     Franchisee fails to pay any trade obligation due to a vendor with whom Company or any of its affiliates does business, as a result of which the vendor withholds or threatens to withhold the sale of goods or services, or withdraws or threatens to withdraw the availability of normal trade terms, to Company, any Company affiliate or another franchisee. REMEDY - Franchisee must pay the obligation in full within 10 days after Company makes written demand for payment, unless Franchisee is actively contesting the amount or validity of the vendor's claim in good faith and promptly furnishes Company a statement of the reasons Franchisee is withholding payment and the action Franchisee is taking to resolve the dispute. So long as Company concurs that Franchisee is actively contesting the claim in good faith, Franchisee may continue withholding payment of the disputed amount until the dispute is resolved.

(5)     Franchisee fails to take appropriate action to correct any deficiency noted in any QSC Inspection report within 15 days after receiving a copy of the report. REMEDY - Franchisee must initiate appropriate corrective action within five business days after Company notifies Franchisee in writing of the condition to be corrected and must complete the corrective action within a reasonable time.

(6)     Franchisee fails to submit when due a report required by Section 7(a)(4) or a financial statement required by Section 7(d)(25), or to furnish a tax return required by Section 7(d)(23) promptly after Company requests it. REMEDY - Franchisee must submit the report, financial statement or tax return within 10 days after Company makes written demand upon Franchisee for its submission.

(7)     Franchisee fails to fulfill any requirement or to perform any obligation set forth Section 5 with respect to System modifications, in Section 7(a) with respect to Charter Documents provisions, or in Section 8 with respect to advertising and promotions (other than a failure to make Ad Fund or Area Cooperative contributions, which are covered by Section 16(c)(1)). REMEDY - Franchisee must correct the failure or breach within 30 days after Company gives Franchisee written notice specifying the default.

(8)     Franchisee or any other Person Bound attempts to hire an employee of Company or another franchisee in violation of Section 7(d)(10); fails or refuses to honor a request for indemnification under Section 7(d)(27); breaches any restriction or obligation set forth in Section 9, Section 12(c) or any related Terms of Use agreement; breaches any covenant or obligation set forth in Sections 12(a), 12(b)(5), or 12(b)(6), or otherwise makes any unauthorized use of a Mark, an item of Copyrighted Materials or an element of the System. REMEDY - The breaching party must remedy the breach, honor the request or permanently cease the unauthorized use within 10 days after Company makes written demand upon Franchisee to take specified curative action.

(9)     Franchisee asserts a claim to the Kolache Factory domain name, any Mark, any item of Copyrighted Materials or any element of the System adverse to Company's interests. REMEDY - Franchisee must unconditionally withdraw the claim within 10 days after Company makes written demand that Franchisee do so.

(10)    The lease for the Store expires or is terminated and Franchisee fails to relocate the Store in accordance with Section 15. REMEDY - Franchisee must reopen the Store in another approved location within 15 days after Company makes written demand that Franchisee do so.

(11)    Franchisee knowingly engages in any activity or business practice that Company reasonably considers detrimental to the goodwill and public image of the Kolache Factory Network. REMEDY - Franchisee must permanently cease the activity or business practice within 10 days after Company makes written demand upon Franchisee to cease any activity specified in the notice.

(c)     Following are Events of Default that Franchisee can cure only by taking voluntarily remedial action of the indicated character before Company gives Franchisee notice of termination or, with respect to the second Event of Default, a transfer occurs.

(1)     Franchisee fails to pay in full when due any royalty or Ad Fund contribution in accordance with Section 10(b), any Area Cooperative contribution in accordance with Section 8, any Internet or Intranet maintenance fee in accordance with Section 9, or any trade account (including shipping charges) payable to Company or its affiliates. ACTION - Franchisee must make payment in full, with interest as provided in Section 14, before Company gives Franchisee notice of termination.

(2)    Franchisee or any other Person Bound either (i) fails to observe or comply with the requirements of Section 13 in connection with any sale, assignment or transfer, or (ii) makes a material representation in any transfer request or document in support of a transfer request. ACTION - Franchisee must correct all elements of non-compliance, including misrepresentations, before the sale, assignment or transfer is completed (including correction of misrepresentations in time for Company to have a reasonable opportunity to consider and act on the corrected information).

(3)    Franchisee or any person acting at Franchisee's direction either refuses to remove and destroy or interferes with a peaceable attempt by Company's representative to remove and destroy any item the freshness, appearance or fitness for human consumption of which is questioned during a QSC inspection. ACTION – After an oral reminder of this Section's contents and consequences by Company's representative, Franchisee must remove and destroy or allow Company's representative to remove and destroy the questioned item before Company's representative completes the QSC inspection and leaves the Store.

(d)    Following are Events of Default that are irreversible and cannot be cured; Franchisee will have no opportunity to cure these Events of Default.

(1)    Franchisee or any other Person Bound breaches the non-competition covenant in Section 19 or the covenants concerning use of the System and the Operations Manual in Sections 12(b)(1), 12(b)(2), or 12(b)(3).

(2)    Franchisee sells the Store's assets or transfers possession of its premises in violation of Section 7(d)(28), or abandons the Store. Franchisee will be conclusively presumed to have abandoned the Store if Franchisee fails to open it for retail trade during normal business hours on more than three consecutive days or on more than four of any 10 consecutive days, in either case excluding periods the Store is undergoing major renovations or remodeling in accordance with a schedule Franchisee has worked out with Company.

(3)    Franchisee or any other Person Bound tampers with or disables the Store's Information Systems or Company's ability to access them, or refuses to permit Company to conduct a QSC Inspection permitted under Section 7(d)(18), an audit permitted under Section 7(d)(24) or a financial records inspection permitted under Section 7(d)(25), or to electronically poll the Store's Information Systems in accordance with Section 7(d)(22).

(4)    Franchisee intentionally revokes the direct debit authorization agreement Section 10(b) requires, or closes the account to which the authorization agreement applies without first having established another royalty payment account and having signed and delivered to Company a new Authorization Agreement for Preauthorized Payments on a form acceptable to Company and its bank.

(5)    Company decides not to exercise the additional option provided in Section 13(h)(4) with respect to the sale of the franchise by a deceased Franchisee's heirs.

(6)    Franchisee and/or any Person Bound commits or allows to occur three or more Events of Default in any 12-month period, whether or not the Events of Default are related types of default and whether or not they are cured.

(7)    Franchisee or any other Person Bound is convicted of, or pleads guilty or no contest to (even if a final court order has not issued), a felony or a crime involving moral turpitude, consumer fraud, or any other crime or offense, or commits any act (regardless of whether such act

constitutes a crime) that in Company's sole opinion is reasonably likely to have an adverse effect on the System or the Marks, or the goodwill associated with the System or the Marks

(8)     Franchisee or any guarantor of Franchisee's monetary obligations to Company becomes insolvent, admits in writing the inability to pay the monetary obligations of Franchisee or the guarantor as they mature, is adjudicated a bankrupt, voluntarily files a petition for liquidation or reorganization under any provision of the United States Bankruptcy Code, makes an assignment for the benefit of creditors or takes any other action pursuant to any federal or state insolvency statute.

(9)     A receiver or trustee is appointed for all or a substantial part of Franchisee's assets, or a judgment for an amount in excess of $5,000 is entered against Franchisee that Franchisee does not pay or cannot stay within 30 days after the judgment is entered.

## 17.    Termination; Other Remedies.

(a)     If Franchisee commits or allows an Event of Default to occur and does not cure it before the related remedial period, if any, expires, Company may at its sole discretion, but subject to compliance with applicable statutory notice and/or hearing requirements, either terminate the franchise and Franchisee's rights under this Agreement or compel Franchisee to sell the Store in accordance with Section 17(d). Upon termination or expiration of the franchise, Franchisee's right and privilege to use the Marks, the Copyrighted Materials, the Trade Secrets and all components of the Operations Manual shall absolutely and unconditionally cease. Franchisee shall immediately:

(1)     discontinue use of the Marks, the Copyrighted Materials, the System and the Trade Secrets;

(2)     return to Company, at Franchisee's expense, the entire grand opening promotional materials, the entire Operations Manual (if in printed format) and any other electronic, web-based, printed, graphic or audio/visual item or item provided in any other media designated by Company as containing Trade Secrets or items that are proprietary to Company;

(3)     remove from the Store's premises all interior and exterior Kolache Factory signs and other uses of the Marks; and

(4)     alter the Store's interior to remove all Trade Dress items and otherwise eliminate the distinctive features of the Store concept.

(b)     Upon the franchise's termination or expiration, Company may immediately file with Franchisee's local telephone company all Assignments of Telephone Numbers that Franchisee provided Company in accordance with Section 7(d)(4), and may instruct the telephone company to transfer use and control of the Store's telephone numbers to Company or its designee. Franchisee irrevocably constitutes and appoints Company and its designees as Franchisee's agent and attorney-in-fact to effect the transfer of the Store's telephone numbers, including authority to execute and deliver on Franchisee's behalf any Transfer of Service Agreement the telephone company requires, and to revoke any call-forwarding or similar instructions Franchisee has given the telephone company. Company shall have no liability to Franchisee on account of or arising from any action it authorizes or takes to effect the transfer of the Store's telephone numbers in accordance with this Section 17(b). In addition, Company shall be entitled to injunctive or similar relief, without bond, against Franchisee and any other Person Bound to enforce compliance with these requirements.

(c)     If Franchisee does not comply with the requirements of Section 17(a) within seven days after the franchise's termination or expiration, Company may, at Franchisee's expense, enter the Store's

premises and effect Franchisee's compliance with all of that Section's requirements, including removal and storage of Franchisee's signs, and alteration or removal and storage of Trade Dress items. Franchisee irrevocably constitutes and appoints Company and its designees as Franchisee's agent and attorney-in-fact to effect compliance with Section 17(a)'s requirements, and Company shall have no liability to Franchisee, in trespass or otherwise, on account of or arising from any action it authorizes or takes to effect Franchisee's compliance. In addition, Company shall be entitled to injunctive or similar relief, without bond, against Franchisee and any other Person Bound to enforce compliance with these requirements.

(d)     In lieu of immediately terminating the franchise in accordance with Section 17(a), Company may order Franchisee to sell the Store and transfer Franchisee's rights under this Agreement to a purchaser designated by or acceptable to Company. After Company orders Franchisee to sell the franchised business, Franchisee shall have no further right or opportunity to remedy a default or to reinstate Franchisee's right to continue operating the Store. Except for Company's right to approve a proposed purchaser's financial and business qualifications and to ensure that all royalties, marketing fees and other amounts due Company are paid at the closing of the sale, Franchisee shall be entitled to establish and negotiate the terms of sale. If Franchisee does not negotiate definitive terms of sale with a qualified purchaser, either designated by Company or located by Franchisee and approved by Company, within 90 days after Franchisee receives Company's demand to sell, or does not consummate the sale within 45 days after negotiations are completed, Company may terminate the franchise under Section 17(a) without further notice.

(e)     In addition to the preceding rights and remedies (and in lieu of immediately exercising its rights under Section 17(a)), Company may notify each distributor of Kolache Factory brand dough balls and other proprietary products and merchandise that Franchisee is no longer authorized to purchase these items or any paper goods imprinted with any of the Marks, and that sales of such merchandise to Franchisee must therefore be discontinued until further notice from Company.

(f)     In addition to the preceding rights and remedies, Company may recover all royalties, Ad Fund contributions, Internet/Intranet maintenance fees and trade obligations due Company, plus interest under Section 14, with or without terminating the franchise. If any such obligation is referred to an attorney for collection or is collected in whole or in part through a judicial proceeding, Franchisee agrees to pay Company's reasonable attorneys' fees and costs of collection, plus a reasonable charge for the staff and administrative time Company expends to enforce its claims.

(g)     In addition to the preceding rights and remedies, Company may cancel Franchisee's account on the Kolache Factory Intranet network and deny Franchisee further access to communication via the Intranet, with or without terminating the franchise.

(h)     In addition to the preceding rights and remedies, Company may obtain injunctive relief, without bond, against Franchisee and/or any other Person Bound restraining the unauthorized or violative use of any Mark, item of Copyrighted Materials or Trade Secret, with or without terminating the franchise.

(i)     In addition to the preceding rights and remedies, Company may recover damages and costs of enforcement (including reasonable attorneys fees) from Franchisee and any other Person Bound for the unauthorized use of any Mark and/or Trade Secret or the unauthorized use, copying or distribution of any item of Copyrighted Materials, and for any loss of customer or future Franchisee goodwill in the Store's Trade Area.

(j)     In addition to the preceding rights and remedies, Company shall have an option (but no obligation) to purchase all or any part of the Store's signs, equipment, fixtures and useable inventory

from Franchisee for 60 days after the franchise expires or is terminated. The purchase price for signs and equipment will equal their net book value (cost, less depreciation) or fair market value, whichever is lower; the purchase price for useable inventory will equal its invoiced cost to Franchisee. The purchase price will be payable in cash (except that Company may assume any note or lease covering signs, equipment or fixtures). Franchisee agrees to provide Company the information necessary to establish the purchase price, to sign and deliver to Company a bill of sale or an assignment of lease, and otherwise to cooperate with Company in its taking title to and delivery of the items Company purchases. If Franchisee fails or refuses to comply with its obligations under this Section during the option period, Company's option will be extended until 15 days after Franchisee complies.

**NOTE:** Termination of the franchise shall ordinarily become effective upon Company's delivery of written notice of termination to Franchisee. However, if (1) an Event of Default occurs, and (2) before Company delivers notice of default and/or notice of termination, a voluntary or involuntary petition is filed under any chapter of the United States Bankruptcy Code by, on behalf of, or against Franchisee, and (3) the Event of Default remains unremedied at the time the bankruptcy or reorganization petition is filed, no notice of default or termination shall be required. Instead, if Franchisee files a voluntary petition for liquidation or reorganization under the United States Bankruptcy Code, termination shall automatically become effective the instant a petition is signed by or on behalf of Franchisee. If an involuntary petition is filed, termination shall automatically become effective the instant the petition is submitted to the clerk of the Bankruptcy Court for filing.

## 18. Damages and Liquidated Damages.

(a) If after (1) the expiration of the franchise in accordance with Section 11, or (2) the termination of the franchise by Company in accordance with Section 17, Franchisee continues to use any of the Marks or element of the System in connection with the continued operation of the Store or otherwise, then, in addition to any other remedies available to Company at law or in equity, Company shall be entitled to collect from Franchisee, and Franchisee agrees to pay a weekly royalty for such use of the Marks and/or the System equal to 150% of the royalties that Franchisee would otherwise have been obligated to pay under Section 10.

(b) If Franchisee unilaterally repudiates and surrenders the franchise before the expiration of its term and, within 24 months after the date of termination, directly or indirectly commences operation of a bakery that produces kolaches as a principal product or of a quick service food business that serves kolaches as a primary menu item, then, in addition to any other remedies available to Company at law or in equity, Company shall be entitled to receive throughout the entire remaining term of the franchise, and Franchisee agrees to pay, a weekly fee equal to 10% of the competing operation's revenues, measured in accordance with the definition of Gross Sales in the Glossary attached to this Agreement.

(c) If Franchisee directly or indirectly opens or participates in the ownership or operation of a business in violation of the covenant not to compete expressed in Section 19, then, in addition to any other remedies available to Company at law or in equity, Company shall be entitled to receive throughout the term of the covenant, and Franchisee agrees to pay, a weekly fee equal to 10% of the competing operation's revenues, measured in accordance with the definition of Gross Sales in the Glossary attached to this Agreement.

(d) If Franchisee disposes of the Store's operating assets or premises in violation of Section 7(d)(28) and the purchaser refuses to sign a Franchise Agreement for the continued operation of the Store as a Kolache Factory Store, then, in addition to any other remedies available to Company at law or in equity, Company shall be entitled to receive, and Franchisee agrees to pay, a sum equal to the royalties Company would otherwise have received during the remaining term of the franchise, discounted to present value. In calculating the royalties Company would otherwise have received, Franchisee will be

deemed to have earned annual Gross Sales for the balance of the franchise term equal to one third of the Store's Gross Sales for the 36 months preceding the date on which the violative disposition occurs.

(e)     Except with respect to Franchisee's and the obligation of each Person Bound to indemnify Company pursuant to Section 7(d)(27), claims for which Company is entitled to liquidated damages, and Company's rights to claim damages pursuant to Section 17(i) for misuse of the Marks, Trade Secrets or Copyrighted Material or other damage to the Company's goodwill, the parties waive to the fullest extent permitted by law any right to or claim for any punitive, exemplary, special and consequential damages against the other and agree that, in the event of an action or claim arising from a dispute between the parties, the parties bringing an action or claim shall be limited to equitable relief and to recovery of any direct or general damages it sustains; provided.

## 19.     Covenant Against Competition.

(a)     In consideration of Company's providing operations and management training to Franchisee and disclosing to Franchisee the System and other Trade Secrets, Franchisee covenants and agrees that, during the term of the franchise and for two years after its expiration or termination, Franchisee will not own or operate, directly or indirectly, or accept employment by or hold an interest in any bakery that produces kolaches as a principal product or in any quick service food business that serves kolaches as a primary menu item, except as a franchisee of Company.

(b)     During the term of the franchise, Franchisee's covenant not to compete will apply universally; for the two-year period after the franchise expires or is terminated, Franchisee's covenant will apply in the DMA in which the Store is located and in each other DMA in which a Company-owned or franchised Store is then operating or under development. For purposes of calculating the duration of the two-year period, any time during which Franchisee is in violation or breach of the covenant shall be excluded.

(c)     Franchisee acknowledges that Franchisee's covenant not to compete is reasonable and necessary to protect the business and goodwill of the Kolache Factory Network and to avoid misappropriation or other unauthorized use of the System and Company's other Trade Secrets.

(d)     Franchisee acknowledges and confirms that Franchisee possesses the education, training and experience necessary to earn a reasonable livelihood apart from operating a business that serves kolaches as its principal product.

## 20.     Partial Invalidity.

The provisions of this Agreement are severable, and if any provision is held illegal, invalid or unenforceable, the holding shall not affect the legality, validity or enforceability of any other provision. Any illegal, invalid or unenforceable provision shall be reformed to the minimum extent necessary to render it legal, valid and enforceable and, as so reformed, shall continue in full force and effect.

## 21.     Notices.

All notices or demands required or permitted under this Agreement shall be in writing and shall be deemed delivered when deposited with the United States Postal Service, first class postage prepaid, certified or registered mail, return receipt requested, addressed, if to Company, to 23240 Westheimer Parkway, Suite A, Katy, Texas 77494, Attn. President; and if to Franchisee, initially to the address shown in the signature block of this Agreement and, after the Store opens, to the address of the Approved Location. Either party may at any time change the address to which notices are to be sent by giving the other at least 10 days' prior notice in accordance with this Section 21.

**22. Status of Parties.**

This Agreement is not intended to create, and shall not be interpreted or construed as creating, a partnership, joint venture, agency, employment, personal services, fiduciary or other "special" relationship between Company and Franchisee, and no representation to the contrary shall be binding upon Company.

**23. Binding Effect.**

This Agreement shall be binding upon and inure to the benefit of Company and Franchisee and their respective successors, assigns, executors, heirs and personal representatives. If Franchisee is, or subsequently transfers the franchise to, a Business Entity, each holder of 15% or more of Franchisee's capital stock or units of beneficial ownership, and each general partner of Franchisee (each a "Person Bound") shall also be personally and individually bound by the provisions of Sections 7(d)(10), 7(d)(24), 7(d)(27), 7(d)(28), 12, 13, 19 and 24 of this Agreement.

**24. Law Governing; Dispute Resolution.**

(a) EXCEPT AS OTHERWISE STIPULATED IN SECTIONS 24(d) AND 24(e), OR UNLESS EXPRESSLY PROHIBITED BY THE FRANCHISING STATUTES OF THE STATE IN WHICH THE STORE IS LOCATED, THIS AGREEMENT SHALL FOR ALL PURPOSES BE GOVERNED BY AND INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS, EXCEPT THAT ITS CHOICE OF LAW AND CONFLICT OF LAW RULES SHALL NOT APPLY.

(b) The parties agree to use their best efforts to resolve and settle by direct, private negotiation any claim, controversy or dispute (a "Dispute") that arises under or in relation to this Agreement or that concerns the relationship created by this Agreement.

(c) If the parties cannot resolve and settle a Dispute by private negotiation within 60 days after one party gives the other written notice that a Dispute exists, the parties mutually agree to submit the Dispute to non-binding mediation, as follows:

(1) Mediation shall occur in Houston, Texas before a single mediator, using the facilities and mediation rules of a professional dispute-resolution organization selected by Company and reasonably acceptable to Franchisee (the "Mediation Organization"). If the parties cannot agree on a Mediation Organization, they will use the facilities and mediation rules of the National Franchise Mediation Program.

(2) The parties shall jointly select a mediator from the panel of mediators maintained by the Mediation Organization. The mediator must be either a retired judge or a person experienced in business format franchising or franchise law who has no prior social, business or professional relationship with either party. If the parties are unable to agree on a mediator within 30 days after the Dispute is submitted to mediation, the Mediation Organization will select a mediator who possesses the indicated qualifications.

(3) The parties will share the mediation filing fee equally, but will otherwise separately bear their own costs and expenses (including legal fees) of participating in the mediation process. Each party agrees to send at least one representative to the mediation conference who has authority to enter into binding contracts on that party's behalf. Each party further agrees to sign a confidentiality agreement that exempts the mediator from disclosing, orally or in writing, any information the other party discloses to the mediator in confidence at any stage of the mediation process.

(4)     If either party fails or refuses to participate in mediation in accordance with this Section 24(c), the other shall be entitled to immediately submit the Dispute to binding arbitration in accordance with Section 24(d).

(d)     If the parties cannot fully resolve and settle a Dispute through mediation within 30 days after the mediation conference concludes, all unresolved issues involved in the Dispute shall be submitted exclusively (except as provided in Sections 24(e) and 24(f) below) to binding arbitration, as follows:

(1)     Either party may make a demand for arbitration.

(2)     Arbitration proceedings shall be conducted in Houston, Texas before a single arbitrator, using the facilities and commercial arbitration rules of the Mediation Organization or another professional dispute-resolution organization selected by Company and reasonably acceptable to Franchisee (the "Arbitration Organization"). If Company selects an Arbitration Organization other than the Mediation Organization and Franchisee reasonably objects to Company's choice, the parties will use the American Arbitration Association's facilities and commercial arbitration rules.

(3)     The Arbitration Organization's expedited arbitration procedure shall apply to the arbitration proceedings. To the greatest extent permitted by law, Company and Franchisee waive the application of all rules of discovery and evidence the Arbitration Organization's expedited procedure does not expressly make applicable.

(4)     The parties shall jointly select an arbitrator from the panel of arbitrators maintained by the Arbitration Organization. The arbitrator must be either a retired judge or an attorney experienced in the practice of franchise law who has no prior social, business or professional relationship with either party and who agrees to follow and apply the express provisions of this Agreement, including the damage provisions, in determining his or her award. If the parties are unable to agree on an arbitrator within 30 days after the arbitration demand is filed, the Arbitration Organization will select a arbitrator who possesses the indicated qualifications.

(5)     The arbitrator's award shall be final and binding on all parties, and neither party shall have any right to contest or appeal the arbitrator's award except on the grounds expressly provided by the United States Arbitration Act (the "Arbitration Act"). The party who demands arbitration shall pay the arbitration filing fee, but the parties will otherwise separately bear their own costs and expenses (including legal fees) of participating in the arbitration process. Responsibility for the arbitrator's fees and expenses shall be determined as part of the arbitrator's award.

(6)     The procedures contemplated by and the enforceability of this Section 24(d) shall be governed by the Arbitration Act and shall be interpreted and enforced in accordance with United States federal judicial interpretations of the Arbitration Act.

(e)     Notwithstanding Sections 24(c) and 24(d), Company shall not be obligated to mediate or arbitrate any claim arising from Franchisee's alleged infringement of the Marks or the Copyrighted Materials, or other alleged misappropriation of Company's intellectual property. The parties agree that any action based on infringement of any of the Marks or Copyrighted Materials, or misappropriation of Company's other intellectual property shall be governed by and interpreted and enforced in accordance with the United States Trademark (Lanham) Act or the United States Copyright Act (whichever applies to the particular action), and shall be litigated in any federal District Court sitting in Harris County, Texas. The parties further agree to submit to the jurisdiction and venue of any such federal District Court

and that service of process by certified mail, return receipt requested, shall be sufficient to confer in personam jurisdiction over them in connection with any intellectual property litigation.

(f)     Further, notwithstanding Sections 25(c) and 25(d), Company shall not be obligated to mediate or arbitrate any claim arising from Franchisee's failure to pay when due any royalty or other monetary obligation to Company. The parties agree that any action to collect any sums that Franchisee owes Company shall be litigated in any federal or state District Court sitting in Harris County, Texas. The parties further agree to submit to the jurisdiction and venue of any such federal or state District Court and that service of process by certified mail, return receipt requested, shall be sufficient to confer *in personam* jurisdiction over them in connection with any collection litigation.

## 25.    **Condition Precedent.**

If Franchisee is a Business Entity, this Agreement will not be binding on Company and no franchise will be granted unless and until each holder of 15% or more of Franchisee's capital stock or units of beneficial ownership, or each general partner of Franchisee executes and delivers a Guaranty and Acknowledgment in the form appended to this Agreement.

## 26.    **Miscellaneous.**

(a)     The term "Franchisee" includes the plural as well as the singular, the masculine and feminine genders and Business Entities, as well as individuals.

(b)     Except as provided in Section 8(a)(5), this Agreement may not be amended, modified or rescinded, or any performance requirement waived, except by a written document signed by Company and Franchisee. The parties expressly agree that this Agreement may not be amended or modified, or any performance standard changed, by course of dealing or inference from a party's conduct. This provision does not apply to changes in the Operations Manual, which Company may modify unilaterally.

## 27.    **Franchisee's Acknowledgments.**

(a)     Franchisee acknowledges and agrees that this Agreement, together with any duly executed amendment or addendum attached to this Agreement, contains the entire agreement between the parties with respect to Franchisee's franchise for the Store, and that it supersedes any prior or contemporaneous agreements between the parties, written or oral, with respect to the franchise for the Store. _JE_ _GB_[FRANCHISEE'S INITIALS]

(b)     Franchisee confirms and acknowledges that no written or oral agreements, promises, commitments, undertakings or understandings were made to or with Franchisee that are not expressly set forth in this Agreement and any duly executed amendment or addendum attached to this Agreement or in the Franchise Disclosure Document Franchisee required by the Trade Regulation Rule of the Federal Trade Commission entitled Disclosure Requirements and Prohibitions Concerning Franchising received in connection with this franchise.
_JC GB_[FRANCHISEE'S INITIALS]

(c)     Franchisee confirms and acknowledges that, except for the Item 19 Financial Performance Representation included in the Franchise Disclosure Document that Company delivered to Franchisee, no person representing Company made any oral, written or visual claim, presentation or representation to Franchisee that stated or suggested that Franchisee's Store might attain any actual, projected or forecasted level of sales, income or profits. _JE_ _GB_[FRANCHISEE'S INITIALS]

(d)     Franchisee confirms and acknowledges that no representation, warranty, guaranty or promise other than those expressly set forth in this Agreement and in the Franchise Disclosure Document that Company delivered to Franchisee was made by Company or any other person to induce Franchisee to sign this Agreement. Franchisee recognizes that neither Company nor any other party can guarantee Franchisee's business success or state the exact costs of opening and operating a Store, and that such success and costs will depend primarily upon Franchisee's own efforts and business ability. Franchisee also recognizes that any new business venture is speculative. ⟨⟩[FRANCHISEE'S INITIALS]

(e)     Franchisee acknowledges that no document that Section 26(b) requires will be binding on Company unless it is signed on Company's behalf by its President.⟨⟩[FRANCHISEE'S INITIALS]

(f)     Franchisee acknowledges that this Agreement creates an arm's length commercial relationship that cannot and will not be transformed into a fiduciary or other "special" relationship by course of dealing, by any special indulgences or benefits that Company bestows on Franchisee, or by inference from a party's conduct.⟨⟩ ⟨⟩[FRANCHISEE'S INITIALS]

(f)     Franchisee acknowledges that it and the owners of any equity interest in Franchisee are knowingly and voluntarily executing, and agreeing to be bound by the terms of, this Agreement and Company has advised Franchisee and the owners of any equity interest in Franchisee to seek legal counsel and a financial advisor to review and evaluate this Agreement.⟨⟩[FRANCHISEE'S INITIALS]

(g)     Franchisee represents and warrants to Company that neither Franchisee, nor any owner of an equity interest in Franchisee, nor any executive officer of Franchisee, nor any of their respective affiliates is identified, either by name or an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (texts available at www.treas.gov/offices/enforcement/ofac/). Further, Franchisee represents and warrants that neither it nor any equity owner, executive officer or affiliate referred to above has violated and agrees not to violate any law prohibiting corrupt business practices, money laundering or the aid or support of Persons who conspire to commit acts of terror against any Person or government, including acts prohibited by the USA Patriot Act (text available at http://www.epic.org/privacy/terrorism/ hr3162.html), U.S. Executive Order 13244 (text available at http://www.treas.gov/offices/enforcement/ofac/sanctions/terrorism.html), or any similar law. The foregoing constitute continuing representations and warranties, and Franchisee shall immediately notify Company in writing of the occurrence of any event or the development of any circumstance that might render any of the foregoing representations and warranties false, inaccurate or misleading.

_____ [FRANCHISEE'S INITIALS]

**KF FRANCHISING, LTD.**

**TASONE LLC**

By: Kolache Factory Management, L.L.C.
    General Partner

By: _____

                         Signature, if an individual

_____

Franchisee's name, printed

Title:  Partner _____

Date: _____

Date:  1\30\15 _____ φ

(Corporate, partnership and limited
liability company franchisees must
complete the following)

By: _____

Title: cfo _____

φ    Considered the Effective Date of this Agreement.

# STATE SPECIFIC ADDENDA

Unofficial Copy Office of Chris Daniel District Clerk

**KF FRANCHISING, LTD.**
**CALIFORNIA AMENDMENT TO FRANCHISE AGREEMENT**

For purposes of complying with the requirements of California law, including the California Franchise Investment Law, CAL. CORP. CODE Section 31000 *et seq.* ("CFIL"), and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 *et seq.* (the "CRA"), KF Franchising, Ltd. and _____ ("You"), hereby amend the Franchise Agreement between them dated _____ (the "Agreement") as follows:

1.      Sections 20000 through 20043 of the CRA provide rights to you concerning nonrenewal and termination of the Agreement. The Federal Bankruptcy Code also provides rights to you concerning termination of the Agreement upon certain bankruptcy-related events. To the extent the Agreement contains a provision that is inconsistent with these laws, these laws will control.

2.      The franchise agreement requires you to execute a general release of claims upon renewal or transfer of the franchise agreement. California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order is void. Section 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code 31000 through 31516). Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code 2000 through 20043).

3.      If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

4.      If the Agreement contains a covenant not to compete which extends beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

5.      If the Agreement requires litigation, arbitration or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

6.      If the Agreement requires that it be governed by a state's law other than the State of California, such requirement may be unenforceable.

7.      All other provisions of the Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties acknowledge that they have read and understand the contents of this Amendment, that they have had the opportunity to obtain the advice of counsel. Intending to be legally bound, the parties have duly executed and delivered this Amendment on _____, 20___.

**KF FRANCHISING, LTD.**

_____
Witness

By: _____
Name: _____
Title: _____

**FRANCHISEE:**

_____
Witness

By: _____
Name: _____
Title: _____

**KF FRANCHISING, LTD.**
**ILLINOIS AMENDMENT TO FRANCHISE AGREEMENT**

For purposes of complying with the requirements of Illinois law, including the Illinois Franchise Disclosure Act of 1987, Ill. Rev. Stat. ch. 815 para. 705/1 – 705/44 (1994) (the "Illinois Franchise Act"), KF Franchising, Ltd. and _____ ("_____"), hereby amend the Franchise Agreement between them dated _____ (the "Agreement") as follows:

1.       Section 705/19 and 705/20 of the Illinois Franchise Act provide rights to franchisees concerning nonrenewal and termination of a franchise. If the Agreement contains a provision that is inconsistent with the Illinois Franchise Act, the Illinois Franchise Act will control.

2.       Section 41 of the Illinois Franchise Act states that "any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void." To the extent that any provision in the Agreement is inconsistent with Illinois law, Illinois law will control.

3.       Any provision that designates jurisdiction or venue or required franchisee to agree to jurisdiction or venue in a forum outside of Illinois is void with respect to any cause of action which is otherwise enforceable in Illinois, except arbitration may take place outside the state of Illinois.

4.       To the extent that Section 24 of the Agreement (pertaining to choice of law) conflicts with the Illinois Franchise Act, the Illinois Franchise Act will control.

5.       Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of Illinois law applicable to the provisions are met independent of this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

6.       All other provisions of the Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties acknowledge that they have read and understand the contents of this Amendment, that they have had the opportunity to obtain the advice of counsel. Intending to be legally bound, the parties have duly executed and delivered this Amendment on _____, 20___.

**KF FRANCHISING, LTD.**

_____          By: _____
Witness                          Name: _____
                                 Title: _____

_____          **FRANCHISEE:**
Witness
                                 By: _____
                                 Name: _____
                                 Title: _____

**KF FRANCHISING, LTD.**
**MARYLAND AMENDMENT TO FRANCHISE AGREEMENT**

For purposes of complying with the requirements of Maryland law, including the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. §§ 14-201 – 14-233 (1994) (the "Maryland Franchise Law"), KF Franchising, Ltd. ("Company") and _____ ("_____"), hereby amend the Franchise Agreement between them dated _____ (the "Agreement") as follows:

1.      Pursuant to COMAR 02.02.08.16L, the Agreement is amended to reflect that:

        (a)     Any release required as part of the Agreement or as a condition of the sale, renewal, or assignment of the franchise shall not apply to any liability under the Maryland Franchise Law.

        (b)     Any claims arising under the Maryland Franchise Law must be brought within three (3) years after the grant of the franchise.

        (c)     Any provision in the Agreement which requires litigation to be conducted in a forum other than the State of Maryland will not limit any rights you may have under the § 14-216(c)(25) of the Maryland Franchise Law to bring suit in the State of Maryland.

2.      All representations in the Agreement requiring you to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Law.

3.      All other provisions of the Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties acknowledge that they have read and understand the contents of this Amendment, that they have had the opportunity to obtain the advice of counsel. Intending to be legally bound, the parties have duly executed and delivered this Amendment on _____, 20___.

**KF FRANCHISING, LTD.**

_____
Witness

By: _____
Name: _____
Title: _____

**FRANCHISEE:**

_____
Witness

By: _____
Name: _____
Title: _____

**KF FRANCHISING, LTD.**
**MINNESOTA AMENDMENT TO FRANCHISE AGREEMENT**

For purposes of complying with the requirements of Minnesota law, including the Minnesota Franchise Act, Minn. Stat. Section 80.01 *et seq.* and the rules and regulations promulgated thereunder, KF Franchising, Ltd. and _____ ("_____"), hereby amend the Franchise Agreement between them dated _____ (the "Agreement") as follows:

1. The Minnesota Department of Commerce requires that KF Franchising, Ltd. indemnify you against liability to third parties for infringement resulting from your use of the trademarks licensed under the Agreement. Section 12 of the Agreement describes the circumstances under which KF Franchising, Ltd. will indemnify you against third party liability for trademark infringement. Requirements imposed under the Minnesota Franchises Act will supersede inconsistent provisions contained in Section 12 of the Agreement.

2. Sec. 80C.14, Subd. 4 of the Minnesota Franchises Act requires, except in certain specified instances, that KF Franchising, Ltd. give you written notice of its intention not to renew the franchise 180 days before the franchise expires, and to give you sufficient opportunity to operate the franchise in order to enable you to recover the fair market value of the franchise as a going concern. Requirements imposed under the Minnesota Franchise Act will supersede inconsistent provisions contained in the Agreement.

3. Sec. 80C.14, Subd. 3 of the Minnesota Franchises Act requires, except in certain specified instances, that KF Franchising, Ltd. give you ninety (90) notice of termination (with sixty (60) days to cure). Requirements imposed under the Minnesota Franchises Act will supersede inconsistent provisions contained in the Agreement.

4. Sec. 80C.14, Subd.5 of the Minnesota Franchises Act prohibits a person to unreasonably withhold consent to an assignment, transfer, or sale of the franchise whenever the franchisee to be substituted meets the present qualifications and standards required of the franchisees of KF Franchising, Ltd.

5. Any release of claims or acknowledgment of fact contained in the Agreement that would negate or remove from judicial review any statement, misrepresentation or action that would violate the Minnesota Franchises Act or a rule or order promulgated thereunder shall be void with respect to claims arising under the Minnesota Franchises Act.

6. Secs. 80C.21 of the Minnesota Franchises Act and Minn. Rule 2860.4400J prohibit KF Franchising, Ltd. from requiring litigation to be conducted outside Minnesota. Nothing in the Agreement will, or is intended to, abrogate or reduce any of your rights as provided for in the Minnesota Franchises Act or your rights to any procedure, forum or remedies provided for by the laws of the Minnesota.

7. Sec. 18 of the Agreement (pertaining to liquidated damages) is hereby deleted; provided that such deletion shall not excuse you from liability for actual or other damages and the formula for assessing liquidated damages shall be admissible in any litigation or proceeding as evidence of actual damages.

8. Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of Minnesota law applicable to the provisions are met independent of this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

9. As to any state law described in this Amendment that declares void or unenforceable any provision contained in the Agreement, KF Franchising, Ltd. reserves the right to challenge the enforceability of the state law.

10. All other provisions of the Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties acknowledge that they have read and understand the contents of this Amendment, that they have had the opportunity to obtain the advice of counsel. Intending to be legally bound, the parties have duly executed and delivered this Amendment on _____, 20___.

**KF FRANCHISING, LTD.**

_____
Witness

By: _____
Name: _____
Title: _____

**FRANCHISEE:**

_____
Witness

By: _____
Name: _____
Title: _____

**KF FRANCHISING, LTD.**
**NEW YORK AMENDMENT TO FRANCHISE AGREEMENT**

For purposes of complying with the requirements of New York law, including the General Business Law, Article 33, Sections 680 through 695 (1989) and the rules and regulations promulgated thereunder, KF Franchising, Ltd. and _____ ("_____"), hereby amend the Franchise Agreement between them dated _____ (the "Agreement") as follows:

1.      If you are required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation or action that would violate the General Business Law, regulation, rule or order under the Law, such release shall exclude claims arising under the New York General Business Law, Article 33, Section 680 through 695 and the regulations promulgated thereunder, and such acknowledgments shall be void.  It is the intent of this provision that non-waiver provisions of Sections 687.4 and 687.5 of the General Business Law be satisfied.

2.      If the Agreement requires that it be governed by a state's law, other than the State of New York, the choice of law provision shall not be considered to waive any rights conferred upon you under the New York General Business Law, Article 33, Sections 680 through 695.

3.      Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of New York law applicable to the provisions are met independent of this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

4.      As to any state law described in this Amendment that declares void or unenforceable any provision contained in the Agreement, KF Franchising, Ltd. reserves the right to challenge the enforceability of the state law.

5.      All other provisions of the Agreement are hereby ratified and confirmed.


IN WITNESS WHEREOF, the parties acknowledge that they have read and understand the contents of this Amendment, that they have had the opportunity to obtain the advice of counsel.  Intending to be legally bound, the parties have duly executed and delivered this Amendment on _____, 20___.


**KF FRANCHISING, LTD.**

By: _____
_____      Name: _____
Witness                          Title: _____


**FRANCHISEE:**

By: _____
_____      Name: _____
Witness                          Title: _____

## EXHIBIT A

### DESCRIPTION OF PRINCIPAL MARKS

| Mark | Registration Date | Class | Registration No. |
|---|---|---|---|
| KOLACHE FACTORY & Design | August 26, 1997 | 30 | 2,091,991 |
| KOLACHE FACTORY & Design | May 22, 2001 | 42 | 2,453,670 |
| KOLACHE FACTORY | May 29, 2001 | 42 | 2,455,909 |
| KOLACHE FACTORY | May 29, 2001 | 30 | 2,455,908 |

**EXHIBIT B**

**DESCRIPTION OF TRADE AREA**

The Store's Trade Area is: A one mile radius from the approved location address listed below.



The street address of the Approved Location is:          To Be Determined

## EXHIBIT C

## AMENDMENT TO FRANCHISE AGREEMENT

This AMENDMENT TO FRANCHISE AGREEMENT, dated as of _____ 30 _____, 2015 (this "Amendment"), is entered into by and among KF Franchising, Ltd., a Texas limited partnership ("Company"), and the franchisee identified in the signature block of this Agreement ("Franchisee"). Terms used but not defined herein shall have the respective meanings assigned to such terms in the Franchise Agreement.

WHEREAS, Company and Franchisee entered into that certain franchise agreement dated the same date as this Amendment (the "Franchise Agreement");

WHEREAS, Company has agreed to reduce the initial franchise fee during 2014;

NOW, THEREFORE, in consideration of the foregoing premise, the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Amendment to the Agreement**.

    a)    Section 3(a) of the Franchise Agreement provides for an initial franchise fee of $35,000. As an incentive to encourage development and operation of Stores, Company has reduced the initial franchise fee to $25,000 and Section 3(a) is hereby so amended.

    b)    This reduction is effective during calendar year ending December 31, 2014 and expires on March 31, 2015.

    c)    This reduction is available for only one franchise to a franchisee.  For example, if Franchisee is a Business Entity, another Store franchisee that is controlled by the same parties who control the Business Entity may not take advantage of this reduction in fees.  "Control" refers to an arrangement by which a person or entity has (i) ownership of more than one-half of the capital or business assets of a Business Entity, its Affiliates, non-individual owners or any successor or assignee thereof, or (ii) ownership of more than one-half of the ownership interest in and/or of the voting rights of, an entity, its Affiliates, non-individual owners or any successor or assignee thereof. "Affiliate" means a person or Business Entity that controls, is controlled by or is under common control with another person or Business Entity, either by virtue of equity ownership, by contract or by other means.

2.    **Effective Date of this Amendment**.  This Amendment shall become effective upon the same date as the Franchise Agreement.

3.    **Effectiveness of Agreement**.  Except as expressly modified by this Amendment, the terms and provisions set forth in the Franchise Agreement as amended by the Amendment remain in full force and effect.

4.    **Governing Law**.  This Amendment shall be governed by and construed in accordance with the laws of the State of Texas without regard to the conflict of laws principles thereof.

5.    **Counterparts**.  This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Amendment shall be effective upon execution and delivery of either manually signed or facsimile signed signature pages.

**EXHIBIT D**

**LEASE RIDER**

This Lease Rider is entered into this ____ day of _____, 20_____ by and among KF Franchising, Ltd., a Texas limited partnership ("Company"), TASONE LLC, a Colorado limited liability company ("Franchisee") and _____ ("Landlord").

WHEREAS, Company and Franchisee are parties to a Franchise Agreement, which is dated ____ _Jan. 30_, 20_15_ (the "Franchise Agreement"); and

WHEREAS, the Franchise Agreement provides that Franchisee will operate a Kolache Factory restaurant ("Restaurant") at a location that Franchisee selects and Company approves; and

WHEREAS, Franchisee and Landlord propose to enter into the lease to which this Rider is attached (the "Lease"), pursuant to which Franchisee will occupy premises located at _____ _____

(the "Premises") for the purpose of constructing and operating the Restaurant in accordance with the Franchise Agreement; and

WHEREAS, the Franchise Agreement provides that, as a condition to Company's authorizing Franchisee to enter into the Lease, the parties must execute this Lease Rider;

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth in this Rider and in the Franchise Agreement, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

1.  During the term of the Franchise Agreement, Franchisee shall be permitted to use the Premises for the operation of the Restaurant and for no other purpose.

2.  Subject to applicable zoning laws and deed restrictions and to prevailing community standards of decency, Landlord consents to Franchisee's installation and use of such trademarks, service marks, signs, decor items, color schemes and related components of the Kolache Factory system as Company may from time to time prescribe for the Restaurant.

3.  Landlord agrees to furnish Company with copies of all letters and notices it sends to Franchisee pertaining to the Lease and the Premises, at the same time it sends such letters and notices to Franchisee.

4.  Company shall have the right, without being guilty of trespass or any other crime or tort, to enter the Premises at any time or from time to time (i) to make any modification or alteration it considers necessary to protect the Kolache Factory system and marks, (ii) to cure any default under the Franchise Agreement or under the Lease, or (iii) to remove the distinctive elements of the Kolache Factory trade dress upon the Franchise Agreement's expiration or termination. Neither Company nor Landlord shall be responsible to Franchisee for any damages Franchisee might sustain as a result of action Company takes in accordance with this provision. Company shall repair or reimburse Landlord for the cost of any damage to the Premises' walls, floor or ceiling that result from Company's removal of trade dress items and other property from the Premises.

5.  Franchisee shall be permitted to assign the Lease to Company or its designee upon the expiration or termination of the Franchise Agreement. Landlord consents to such an assignment

D-1

**IN WITNESS WHEREOF**, each of the undersigned Parties has duly executed this Amendment as of the date first set forth above.

**COMPANY:**

Kolache Factory, Ltd, a Texas limited partnership

By: _____

    Name:    John Banks
    Title:    President of Kolache Factory
    Management, L.L.C., General Partner

**FRANCHISEE:**

TASONE LLC, a Colorado limited liability company

By: _____

    Name:    Steve Boles
    Title:    CFO

and agrees not to impose any assignment fee or similar change, or to increase or accelerate rent under the Lease, in connection with such an assignment.

6. If Franchisee assigns the Lease to Company or its designee in accordance with the preceding paragraph, the assignee must assume all obligations of Franchisee under the Lease from and after the date of assignment, but shall have no obligation to pay any delinquent rent or to cure any other default under the Lease that occurred or existed prior to the date of the assignment.

7. Franchisee may not assign the Lease or sublet the Premises without Company's prior written consent, and Landlord will not consent to an assignment or subletting by Franchisee without first verifying that Company has given its written consent to Franchisee's proposed assignment or subletting.

8. Landlord and Franchisee will not amend or modify the Lease in any manner that could materially affect any of the provisions or requirements of this Lease Rider without Company's prior written consent.

9. The provisions of this Lease Rider will supersede and control any conflicting provisions of the Lease.

10. Landlord acknowledges that Company is not a party to the Lease and shall have no liability or responsibility under the Lease unless and until the Lease is assigned to, and assumed by, Company.

   **IN WITNESS WHEREOF**, the parties have executed this Lease Rider of the date first above written

**COMPANY:**

KF FRANCHISING, LTD., a Texas limited partnership

By: _____

Name:   John Banks

Title:   Limited Partner

**LANDLORD:**

_____

By: _____

Name: _____

Title: _____

**FRANCHISEE:**

TASONE LLC, a Colorado limited liability company

By: _____

Name:   Steve Boles.

Title:   CFO

**EXHIBIT E**

## ELECTRONIC DEBT AUTHORIZATION
### Authorization Agreement for Direct Payments (ACH Debits)

Company Name: KF Franchising, Ltd.          Company ID Number: 76-0669071

I (we) hereby authorize KF Franchising, Ltd/, hereinafter called COMPANY, to initiate debit entries to my (our ) ☐ Checking Account/ ☐ Savings Account (select one) indicated below at the depository financial institution named below, hereafter called DEPOSITORY, and to debit the same to such account. I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

Depository Name:_____          Branch:_____

City:_____          State:_____          Zip:_____

Routing Number:_____          Account Number:_____

This authorization is remain in full force and effect until COMPANY has received written notification from me (or either of us) or its termination in such time and in such manner as to afford COMPANY and DEPOSITOR a reasonable opportunity to act on it.

Name(s):_____          ID Number:_____
         (Please Print)

Date:_____          Signature:_____

**NOTE: DEBIT AUTHORIZATIONS MUST PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION.**

**ATTACH VOIDED CHECK HERE**

## EXHIBIT F

## ASSIGNMENT OF TELEPHONE NUMBERS

This Assignment relates to:

Name of Franchisee:___TASONE LLC_____

Address of Store: _____TBD_____

Telephone Number(s):(___) ____TBD_____; (___)_____ ; (___)_____

For valuable consideration, the Franchisee identified above ("Franchisee") assigns and transfers to KF Franchising, Ltd. ("Company") all of Franchisee's rights and interests in each and all of the telephone numbers listed above (the "Numbers").

Franchisee authorizes Company to file this Assignment with the telephone company that issued the Numbers for the purposes of establishing Company's claim to and right to designate the user of the Numbers.

Franchisee irrevocably constitutes and appoints Company as Franchisee's agent and attorney-in-fact for the purposes of (i) signing and delivering any Transfer of Service Agreement or comparable document the telephone company requires to transfer the rights in the Numbers from Franchisee to Company or its designee, and (ii) canceling and revoking any call-forwarding or similar instructions Franchisee has issued to the telephone company with respect to any of the Numbers, with full power to sign Franchisee's name and otherwise to act in Franchisee's name, place and stead.

Franchisee agrees to reimburse Company the full amount of any local service and long distance charges the telephone company requires that Company paid to obtain the Numbers, together with interest as provided in the Franchise Agreement for the Store.

Franchisee represents and warrants to Company that Franchisee obtained the Numbers in his or her own name, and that Franchisee is the person of record the telephone company will recognize as registered user or "owner" of the Numbers.

_____

Franchisee's signature

_____

Franchisee's name, printed

## GLOSSARY OF TERMS

The following terms are used in the preceding Franchise Agreement ("Agreement") with the meanings assigned in this Glossary.

**Ad Fund** has the meaning assigned in Section 8(a)(1).

**Business Entity** means a corporation, partnership, limited partnership, limited liability company, business trust or other entity through two or more investors may conduct business.

**Catering** means the delivery and service of kolaches, complementary menu items and non-alcoholic drinks at school events, charity functions, community festivals, business gatherings, private parties and similar events.

**Charter Documents** means a corporation's articles of incorporation, by-laws and shareholders agreement (if any); a partnership's partnership agreement and, in the case of a limited partnership, its articles of limited partnership; a limited liability company's articles of association and regulations or operating agreement; and comparable governing documents of any other type of Business Entity.

**Copyrighted Materials** refers to and includes all versions, variations and adaptations of the following materials in tangible form, either produced by Company, produced on its behalf as works for hire, or derived from works produced by or on behalf of Company: (i) all manuals used in a Store's development, operation and marketing activities, including but not limited to the Operations Manual, (ii) training materials (including printed, audio, video or electronic materials), (iii) Store plans and specifications that are works for hire, (iv) menu board designs and graphics, (v) product identification posters and photographs, (vi) advertising and marketing materials, (vii) labels, forms and reports provided by Company, (viii) any computer software developed by Company or as works for hire for use in the operation of Stores, and (ix) any other materials protected by copyright law or marked or identified by Company as protected by copyright.

**Delivery Service** means the delivery of food and beverages in prepackaged portions to residential customers. Delivery service does not include on-site set up, food service or clean up.

**Development Agreement** means the Area Development Agreement between Company and Franchisee under which Franchisee undertook the Store's development.

**DMA** means Designated Market Area, an advertising term that Neilson Rating Service uses to demarcate the primary coverage of broadcast and print media in given markets. The boundaries of a particular DMA will be determined by reference to television coverage.

**Effective Date** means the date Company signs the Agreement, as indicated in its signature block.

**General Manager** means an individual appointed by Franchisee to supervise and manage all aspects of the Store's day-to-day operations and with whom Company and its staff may deal exclusively for purposes of administering and coordinating the franchise relationship. Franchisee's first General Manager is identified beneath the signature block of the Agreement.

**Gross Sales** means the aggregate revenues the Store receives from the sale of, or the provision of services with respect to, food, beverages, other menu items and other merchandise, whether for cash or on credit, less applicable sales taxes Franchisee collects and remits, and valid coupon credits and

employee discounts deducted from revenues initially recorded as Gross Sales, but without deduction of any other costs or expenses whatsoever.

**Hospitality Center** means a hotel, lodge, country club, social club, resort, casino, theater or similar facility that provides recreation, entertainment or lodging either to the general public or to private members.

**Indemnified Matter** has the meaning ascribed in Section 7(d)(27).

**Indemnified Parties** means Company and the officers, directors, shareholders, partners, members, employees, agents, successors and assigns of Company and of any legal entity that controls, is controlled by or is under common control with Company.

**Information Systems** means electronic systems an operator uses to collect, compute, store and report a Store's Gross Sales, other financial data and operating information, such as cash registers, computers, peripheral equipment and related software programs.

**Institution** means a hospital, airport, public or private school, university or college campus, airport terminal, convention center, exhibition hall, amusement park, fair ground, sports arena, military base, state or national park, or other facility in which Special Outlets are frequently located.

**Kolache Factory Network** means the chain of Kolache Factory Stores, including those owned by Company and by franchisees.

**Marks** refers to and includes (i) the Kolache Factory service mark and logo, (ii) the Kolache Factory trade name, (iii) the elements and components of a Store's Trade Dress, and (iv) any and all additional or different trade names, trademarks, service marks, logos and slogans that Company adopts to identify the Kolache Factory Network and the products and services Stores offer. The Kolache Factory registered trademarks are described in Exhibit A.

**Mall** means an assembly of retail establishments housed in a structure that encloses more than 250,000 square feet of floor space (including common areas) under a single roof.

**MEP** means mechanical, electrical and plumbing.

**Operations Manual** means and collectively includes all manuals, policy statements, directives, bulletins and memoranda that contain prescribed or recommended specifications, standards, procedures, policies and advice relating to a Store's operation and management and to marketing the products Stores serve. The Operations Manual discloses the principle elements of Company's proprietary System, and its contents are and shall remain Company's exclusive property. The Operations Manual may be provided electronically or in hardcopy as determined by Company from time to time.

**Operations Specialist** has the meaning assigned in Section 6(b)(1).

**Person Bound** is defined in Section 23.

**QSC Inspections** means physical, on-site inspections of a Store to determine the degree to which its operation satisfies Company's quality, service and cleanliness standards.

**Special Outlet** means a temporary or seasonal booth, a kiosk, a satellite unit, an express unit, a mini-store, or similar installation, no matter how denominated. The term also includes a mobile

dispensing unit, such as a cart or customized RV, but does not include an automobile or van used predominately for Catering or Delivery Service.

**Store** means a retail establishment at a fixed (permanent) location outside an Institution or Hospitality Center that operates on a year-round basis under the Kolache Factory trade name and System. The term does not include any type of Special Outlet.

**System** means the compilation of operating procedures, marketing concepts, management techniques, and communications methods and procedures that Company has developed or adopted to govern the operation of Stores, the marketing of their products and services, and the methods of communication between and among Company and Store operators.

**Trade Dress** means decorative, non-functional components of a Store that provide the establishment a distinctive, memorable appearance.

**Trade Secrets** means the components of the System, the contents of the Operations Manual and of all employee training materials and computer programs developed by Company or in accordance with its specifications, and any other confidential information that Company imparts to Franchisee with respect to a Store's operation or management, whether through the Operations Manual or otherwise.

**Training Facility** means a Company-operated Store that Company has designated as the location at which it will provide training for Franchisee's managerial-level employees.

## GUARANTY AND ACKNOWLEDGMENT

The undersigned (whether one or more, herein called "Guarantors"), general partners or holders of 15% or more of the outstanding equity interests in the Franchisee under the Franchise Agreement to which this Guaranty and Acknowledgment is annexed, jointly and severally, absolutely and unconditionally guarantee to KF Franchising, Ltd., its successors and assigns ("Company"):

      (1)    The faithful and punctual performance of each and every duty and obligation of the Franchisee under the Franchise Agreement;

      (2)    The payment in full when due of all royalties, Ad Fund contributions, Internet/Intranet maintenance fees, and trade accounts payable by the Franchisee to Company;

      (3)    The payment in full when due of all contributions payable by the Franchisee to any Area Cooperative that the Franchisee may join pursuant to Section 8 of the Franchise Agreement; and

      (4)    The payment in full when due of any and all amounts for which the Franchisee may become obligated pursuant to Sections 13, 14, 17, 18 and 24 of the Franchise Agreement.

The monetary obligations described in clauses (2) through (4) above are called "Debts".

This is a continuing Guaranty and applies to all Debts for or with respect to which the Franchisee may become obligated, whether during the initial term of the franchise, any renewals or extensions thereof, or, with respect to Debts described in clause (4) above, after the franchise's expiration, termination or cancellation. This Guaranty shall be binding upon each Guarantor's heirs, executors, administrators, guardians, successors and assigns, and under no circumstances will any Guarantor's obligations under this Guaranty be released or extinguished without Company's written consent and release or until all Debts have been paid in full, whether or not a Guarantor's interest in the Franchisee is transferred, sold or otherwise surrendered.

Guarantors expressly waive demand and diligence on the part of the Company in the collection of any of the Debts and agree to all extensions that may be granted to the Franchisee by Company. Company shall be under no obligation to notify Guarantors of any sales or extensions of credit to the Franchisee in reliance on this Guaranty, or of the failure of the Franchisee to pay any of the Debts when due, or to use diligence in preserving the liability of any person on the Debts or in bringing suit or in taking other action to enforce collection of the Debts.

If the Franchisee's status should change through merger, consolidation or otherwise, this Guaranty shall cover the Debts of the Franchisee under its new status, according to the terms of this Guaranty.

Company shall not be required to pursue or exhaust any remedies against the Franchisee, to foreclose its interest in any collateral now or hereafter held by Company as security for the payment of the Debts, to terminate the Franchise Agreement or to take any other action before requiring payment under this Guaranty. Without in any manner impairing or diminishing the obligations of Guarantors under this Guaranty, Company may elect to pursue any legal or equitable remedy available against the Franchisee or against any collateral held by Company, even though the exercise by Company of such remedy results in loss to Guarantors of any right of subrogation or right to proceed against the Franchisee for reimbursement.

If the Franchisee is not liable on any of the Debts because the act of their creation is ultra vires, or if the officers or persons incurring any of the Debts acted in excess of their authority, and therefore the

Debts cannot be enforced against the Franchisee, Guarantors shall nevertheless be liable under this Guaranty.

If any payment by the Franchisee to Company is held to be a preference under the United States Bankruptcy Code, or if for any other reason Company is required to refund such payment or pay the amount thereof to any other person, such payment by the Franchisee shall not constitute a discharge of Guarantors from any liability under this Guaranty, and Guarantors agree to pay such amount to Company upon demand.

Each Guarantor represents that he or she owns a substantial equity interest in the Franchisee and that he or she is receiving consideration from the Debts that is a material, direct benefit to such Guarantor.

Each Guarantor agrees that this Guaranty is to be performed by Guarantors in Houston, Harris County, Texas, that this Guaranty shall be deemed to be a contract made under the laws of Texas and that this Guaranty and the rights of the parties hereto shall be governed by, interpreted in accordance with, and enforced under Texas law. Guarantors agree to pay Company's reasonable attorney's fees if this Guaranty is placed in the hands of an attorney for collection, or if it is collected through a proceeding in any court.

The provisions of Sections 7(d)(10), 7(d)(24), 7(d)(27), 7(d)(28), 12, 13, 19 and 24 of the Franchise Agreement are incorporated into this Guaranty and Acknowledgment by this reference. Each Guarantor acknowledges the contents of and agrees to be personally bound by the restrictions, limitations and obligations set forth in each of those Sections to the same extent as though Guarantors were the Franchisee.

## GUARANTORS' SIGNATURES

Signature: _____

Name Printed: Steve Boles

Street Address: 6633 wccch St.   Arvada   Co   80004

Telephone Number: 303 - 929 - 9692.

Signature: _____

Name Printed: _____

Street Address: _____

Telephone Number: _____

Signature: _____

Name Printed: _____

Street Address: _____

Telephone Number: _____



## KF FRANCHISING, LTD

### FRANCHISE AGREEMENT RECEIPT

I (We), the undersigned, hereby acknowledge that I (we) have received a completed Kolache Factory Franchise Agreement for review of all material terms. I (we) acknowledge further that this Agreement may not be executed before the expiration of at least 7 (seven) calendar days from receipt date indicated below.

Franchise Agreement forwarded to Franchisee on ____ of ____, 2015

FRANCHISEE:

TASONE LLC

Printed Name: STEve Boles

Title: CFO

Receipt Date: 1/19/15

By:_____

Printed Name:_____

Title:_____

Receipt Date:_____

Unofficial Copy Office of Chris Daniel District C...

# EXHIBIT B

Unofficial Copy Office of Chris Daniel District Clerk

## GUARANTY AND ACKNOWLEDGMENT

The undersigned (whether one or more, herein called "Guarantors"), general partners or holders of 15% or more of the outstanding equity interests in the Franchisee under the Franchise Agreement to which this Guaranty and Acknowledgment is annexed, jointly and severally, absolutely and unconditionally guarantee to KF Franchising, Ltd., its successors and assigns ("Company"):

(1)     The faithful and punctual performance of each and every duty and obligation of the Franchisee under the Franchise Agreement;

(2)     The payment in full when due of all royalties, Ad Fund contributions, Internet/Intranet maintenance fees, and trade accounts payable by the Franchisee to Company;

(3)     The payment in full when due of all contributions payable by the Franchisee to any Area Cooperative that the Franchisee may join pursuant to Section 8 of the Franchise Agreement; and

(4)     The payment in full when due of any and all amounts for which the Franchisee may become obligated pursuant to Sections 13, 14, 17, 18 and 24 of the Franchise Agreement.

The monetary obligations described in clauses (2) through (4) above are called "Debts".

This is a continuing Guaranty and applies to all Debts for or with respect to which the Franchisee may become obligated, whether during the initial term of the franchise, any renewals or extensions thereof, or, with respect to Debts described in clause (4) above, after the franchise's expiration, termination or cancellation. This Guaranty shall be binding upon each Guarantor's heirs, executors, administrators, guardians, successors and assigns, and under no circumstances will any Guarantor's obligations under this Guaranty be released or extinguished without Company's written consent and release or until all Debts have been paid in full, whether or not a Guarantor's interest in the Franchisee is transferred, sold or otherwise surrendered.

Guarantors expressly waive demand and diligence on the part of the Company in the collection of any of the Debts and agree to all extensions that may be granted to the Franchisee by Company. Company shall be under no obligation to notify Guarantors of any sales or extensions of credit to the Franchisee in reliance on this Guaranty, or of the failure of the Franchisee to pay any of the Debts when due, or to use diligence in preserving the liability of any person on the Debts or in bringing suit or in taking other action to enforce collection of the Debts.

If the Franchisee's status should change through merger, consolidation or otherwise, this Guaranty shall cover the Debts of the Franchisee under its new status, according to the terms of this Guaranty.

Company shall not be required to pursue or exhaust any remedies against the Franchisee, to foreclose its interest in any collateral now or hereafter held by Company as security for the payment of the Debts, to terminate the Franchise Agreement or to take any other action before requiring payment under this Guaranty. Without in any manner impairing or diminishing the obligations of Guarantors under this Guaranty, Company may elect to pursue any legal or equitable remedy available against the Franchisee or against any collateral held by Company, even though the exercise by Company of such remedy results in loss to Guarantors of any right of subrogation or right to proceed against the Franchisee for reimbursement.

If the Franchisee is not liable on any of the Debts because the act of their creation is ultra vires, or if the officers or persons incurring any of the Debts acted in excess of their authority, and therefore the

Debts cannot be enforced against the Franchisee, Guarantors shall nevertheless be liable under this Guaranty.

If any payment by the Franchisee to Company is held to be a preference under the United States Bankruptcy Code, or if for any other reason Company is required to refund such payment or pay the amount thereof to any other person, such payment by the Franchisee shall not constitute a discharge of Guarantors from any liability under this Guaranty, and Guarantors agree to pay such amount to Company upon demand.

Each Guarantor represents that he or she owns a substantial equity interest in the Franchisee and that he or she is receiving consideration from the Debts that is a material, direct benefit to such Guarantor.

Each Guarantor agrees that this Guaranty is to be performed by Guarantors in Houston, Harris County, Texas, that this Guaranty shall be deemed to be a contract made under the laws of Texas and that this Guaranty and the rights of the parties hereto shall be governed by, interpreted in accordance with, and enforced under Texas law. Guarantors agree to pay Company's reasonable attorney's fees if this Guaranty is placed in the hands of an attorney for collection, or if it is collected through a proceeding in any court.

The provisions of Sections 7(d)(10), 7(d)(24), 7(d)(27), 7(d)(28), 12, 13, 19 and 24 of the Franchise Agreement are incorporated into this Guaranty and Acknowledgment by this reference. Each Guarantor acknowledges the contents of and agrees to be personally bound by the restrictions, limitations and obligations set forth in each of those Sections to the same extent as though Guarantors were the Franchisee.

## GUARANTORS' SIGNATURES

Signature: _____

Name Printed: Steve Boles

Street Address: 6633 wccck st Aurora Co 80004

Telephone Number: 303 - 929 - 9692.

Signature: _____

Name Printed: _____

Street Address: 9633 wclcb st.

Telephone Number: 702 - 933 - 7896

Signature: _____

Name Printed: _____

Street Address: _____

Telephone Number: _____

# EXHIBIT C

Unofficial Copy Office of Chris Daniel District Clerk



## KF FRANCHISING, LTD

July 8, 2016

**VIA EMAIL, CERTIFIED & OVERNIGHT DELIVERY**

TASONE Inc
6633 Welch St.
Arvada, CO 80004
Attn: Steve Boles and Razije Elez

TASONE Inc
9998 West Colfax Avenue
Lakewood, CO 80215
Attn: Steve Boles and Razije Elez

**RE: Notice of Default**

Dear Steve and Raza,

This notice of default ("Notice") outlines certain material defaults and related deficiencies that KF Franchising, Ltd. ("Company") has discovered with respect to your franchise operations under the Kolache Factory Franchise Agreement dated January 30, 2015 (the "Franchise Agreement") between Company and TASONE inc, a Colorado corporation with its principal address at 6633 Welch St., Arvada, CO 80004 (formerly known as Tasone LLC) ("Franchisee"), relating to the development and operation of the Kolache Factory Store located at 9998 West Colfax Avenue, Lakewood, Colorado 80215 (the "Store"). All capitalized terms used in this Notice but not otherwise defined shall have the meanings ascribed to them in the Franchise Agreement.

## Approved Products Default

As you know, Section 7(d)(6) of the Franchise Agreement require Franchisee to, among other things:

(i) comply with and adhere to the policies and procedures set forth in the Operations Manual, as revised and supplemented from time to time,

(ii) follow Company procedures in the preparation, baking, storage, presentation and dispensing of kolaches, other authorized menu items and other authorized Store merchandise,

(iii) purchase and use fresh, processed and prepackaged ingredients that satisfy or exceed the minimum grade or quality standards Company from time to time specifies;

(iv) purchase from Company or a source Company designates and exclusively use Kolache Factory brand dough balls and other proprietary products;

(v) purchase inventory and supplies only from suppliers Company designates or approves from time to time; and

(vi) follow Company's procedures for submission of vendors, suppliers or providers for approval who have not been previously approved or designated by Company, including the payment of a reasonable fee for such consideration by Company.

Further, Section 7(d)(11) of the Franchise Agreement require Franchisee to, among other things, offer all foods and beverages included on Company's standard menu, as revised from time to time, and not offer any foods, beverages or other merchandise that is not included on Company's authorized Store merchandise list, as revised from time to time, without Company's prior written consent.

On July 6, 2016, Company's representative inspected Franchisee's Store and discovered, among other things, the following material food product preparation, storage and usage deficiencies and other operational deficiencies, each of which constitute separate, actionable defaults under Section 16(b)(3) of the Franchise Agreement and require full and complete cure, as follows:

| Material Default | Cure Requirement |
|---|---|
| 1. Improper food product preparation of Bacon & Cheese products (product ground through grinder) | 1. Cessation of grinding of food product and preparation in accordance with Company recipe |
| 2. Improper food product preparation of Pepperoni products (product ground through grinder) | 2. Cessation of grinding of food product and preparation in accordance with Company recipe |
| 3. Improper food product preparation of Philly Steak & Cheese products (product ground through grinder) | 3. Cessation of grinding of food product and preparation in accordance with Company recipe |
| 4. Improper food product pre-cooking of Sausage (product pre-cooked and stored overnight) | 4. Cessation of pre-cooking and fresh preparation of food product each morning as needed with no hold over of food product |
| 5. Improper food product pre-cooking of Chorizo (product pre-cooked and stored overnight) | 5. Cessation of pre-cooking and fresh preparation of food product each morning as needed with no hold over of food product |
| 6. Improper food product pre-cooking of Italian Sausage (product pre-cooked and stored overnight) July KOTM Sausage and Peppers | 6. Cessation of pre-cooking and fresh preparation of food product each morning as needed with no hold over of food product |

## Training Default

Sections 7(d)(3) and 7(d)(9) of the Franchise Agreement require Franchisee to, among other things, (1) have a dedicated trained and certified General Manager that has completed a minimum of 220 hours of training for certification, (2) ensure that Franchisee and two managerial-level individuals must have satisfactorily completed and received certification from Company's current training program, and (3) ensure that the required personnel attend and satisfactorily complete the training program and that they receive certification before the Store opens for business.

Company has discovered that Steve Boles is performing the back-of-the house preparation of food product and effectively acting in a General/Kitchen Manager capacity. Steve Boles has not satisfactorily completed and received certification from Company's current training program. Accordingly, Franchisee must cure this training default by causing Steve Boles to travel to Houston, Texas for 5 days to satisfactorily complete and receive certification from Company's current training program.

**Franchisee's material defaults put Franchisee at risk of termination of the Franchise Agreement and the loss of any and all rights Franchisee has to use the Marks and the System at the Store. Pursuant to Section 16(b)(3) of the Franchise Agreement, Franchisee shall have 30 days from its receipt of this Notice to cure all of its material defaults in the**

manner specified above with respect to the applicable default.  If Franchisee fails to cure each and every default, Company will have the right to terminate the Franchise Agreement and any and all rights Franchisee has to use the Marks and the System at the Store, upon written notice to Franchisee.

Company confirms that its expects to conduct a follow up inspection of the Store to confirm whether Franchisee has cured its material defaults described in this Notice (and not developed any additional new defaults) on or about the date that is 30 days from Franchisee's receipt of this Notice.

Neither this Notice nor any action taken by Company to enforce its rights under the Franchise Agreement, nor continuing to transact business with Franchisee from and after the date of this Notice, shall be deemed an election of remedies or a waiver of any other rights or actions Company may have against Franchisee at law or in equity.  Company expressly reserves all of its rights and remedies under the Franchise Agreement and applicable law.

Please contact me if you have any questions regarding this Notice, or to arrange for timely cure of Franchisee's material defaults.

Sincerely,
**KF Franchising, Ltd.**

Dawn Nielsen
Vice President, Kolache Factory Inc.

Cc:    Correspondence File
       Robert A. Lauer, Haynes and Boone, LLP



# **Field Visit Confirmation**

| | |
|---|---|
| Score: | 0 |
| Location Number: | 94 |
| Location Address: | 9998 West Colfax Avenue |
| City: **Lakewood** | State: **CO** |
| Date of Visit: **07/06/2016** | Day of Visit: **Wednesday** |
| Time of Visit: | 09:30 AM |
| Year: **2016** | Period: **07** |

Unofficial Copy Office of Chris Daniel District Clerk

## Field Supervisor Visit (+55)

**I visited the selected franchisee and as the field supervisor for Kolache Factory, Inc., I found the following:**

| | Excellent | Good | Need Work (list specifics below) | Poor | |
|---|---|---|---|---|---|
| **Cleanliness Front of House** | | | ✓ | | +5 |

Comments:
*N/A*

| | Excellent | Good | Needs Work (list specifics below) | Poor | |
|---|---|---|---|---|---|
| **Cleanliness of Restrooms** | | | ✓ | | +1 |

Comments:
*N/A*

| | Excellent | Good | Needs Work (list specifics below) | Poor | |
|---|---|---|---|---|---|
| **Cleanliness Back of House** | | | ✓ | | +2 |

Comments:
*N/A*

| | Regulation | Items Missing (list specifics below) | Colors Wrong (list specifics below) | Other (list specifics below) |
|---|---|---|---|---|
| | | | | |

| | Regulation | Items Missing (list specifics below) | Colors Wrong (list specifics below) | Other (list specifics below) | |
|---|---|---|---|---|---|
| **Uniforms** | ✓ | | | | +5 |

Comments:

*N/A*

| | Excellent | Good | Needs Work (list specifics) | Poor | |
|---|---|---|---|---|---|
| **Product** | | | ✓ | | +5 |

Comments:

*After arriving in the store and talking to Raza for a few minutes I proceeded to check on the product and prep for the next morning & what the store had on hand in the refrigerator. I found the bacon & cheese mix, pepperoni, philly steak & cheese ground up thru the grinder. Also, I found cooked sausage, chorizo and sweet Italian sausage in bowls inside the refrigerator for use on the following days these items are to be cooked fresh every day. I proceeded to discuss this issues I found with Raza and she told me "I have too talk to Steve, he was the one in-charge of the kitchen" (Steve has not gone through KF Certification Training).*

*Raza gave me the phone so I could talk to Steve and I continued to inform Steve that some of the prep was not in KF standards and I was going to throw all of it away roughly 30 lbs. of meat. After talking to Steve I proceeded to throw away the ground bacon & cheese, pepperoni, philly & cheese mix, and the cooked chorizo. I told Steve we could use all the cooked ground sausage for sausage & gravy. During this time Raza sent an email to Dawn Nielsen, Vice President, expressing her anger towards Hermann, throwing away their food.*

*After a few minutes Steve showed up and we discuss what had happened and why I had thrown the product away--he walked out; so, I continue helping his staff prepping the pepperoni for the next day. After a few minutes later Steve ask me to talk to him in the store's office - after a few minutes of Steve and I discussing all items and issues of all what had happened Raza came in the store's office and informed Steve not to talk to me anymore since Kolache Factory Corporate was contacting the attorney--at this point I called John Banks and he informed me to come back to Houston.*

*A full complete Field Visit Confirmation Report could not be completed due to franchisees anger towards food being discarded.*

| **KOTM product on shelves?** | | | | Yes | +5 |
|---|---|---|---|---|---|

Comments:

*N/A*

| **KOTM signage displayed?** | | | | Yes | +5 |
|---|---|---|---|---|---|

Comments:

*N/A*

| | Excellent | Good | Average | Poor | |
|---|---|---|---|---|---|
| **KOTM quality of product:** | | ✓ | | | +4 |

Comments:

*N/A*

| | Excellent | Good | Average - some customers greeted and thanked | Poor (list specifics below) | |
|---|---|---|---|---|---|
| **Customer Service** | ✓ | | | | +15 |

Comments:

*N/A*

| | Always Up Sells | Mostly Up Sells | Sometimes Up Sells | Never Up Sells | |
|---|---|---|---|---|---|
| **Up Selling** | | ✓ | | | +3 |

Comments:

*N/A*

| | |
|---|---|
| **Paperwork** | None |

Comments:

*N/A*

| | |
|---|---|
| **Current KF Franchise Operations Manual on hand?** | No |
| **Other*:** | No |

Comments:
*Other can be issues that may or may not affect business or interfere with brand image. Ex. Broken down equipment, broken tiles, exterior signage issues or anything structural that needs to be addressed. If not corrected promptly could become a violation of your franchise agreement.

| | |
|---|---|
| **Are health regulations being followed**?** | No |

Comments:

*N/A*

| | | |
|---|---|---|
| **Are unauthorized products on hand**?** | No | +5 |

Comments:

*N/A*

| | |
|---|---|
| **Are there any major violations**?** | Yes |

If any of the above questions are a violation, a detailed description must be explained below:

*See notes on product.*

Supervisor/District Manager Comments:

*Lakewood store #094 needs to send to KF Corporate their new kitchen manager. if Steve Boles is going to be in-charge of the store's production he also needs to come for the KF Manager's Certification training in Houston.*

****Note: If any major violations are found upon this inspection, franchise must cure immediately from date of report.**

## Field Visit Photos

Attach images here. The image must be under 10mb in size and in .JPG or .GIF format.

Attach image here:

Attach image here:

Attach image here:

Attach image here:

Attach image here:

Attach image here:

Attach image here:

Attach image here:

Attach image here:



### *FRANCHISEE ACKNOWLEDGEMENT OF FIELD VISIT*

**Please fill out below. If you have any additional comments or concerns please note them here:**

At this time:

_____ I am satisfied with the franchisor's (Kolache Factory) support and at this time do not require additional assistance.

_____ I am in need of additional support from the franchisor (Kolache Factory). If checked please explain below how we can assist you.

Additional Comments From Franchisee:

_____
Franchise Signature

_____
Franchise Signature Date

_____
Supervisor/District Manager Signature

_____
Supervisor/District Manager Signature Date

_____

This Field Visit confirmation will be completed on every visit to your store. Upon completion if will be emailed Return Receipt Requested. It is the responsibility of the franchisee to ensure they have checked their email for their copy. Franchisees are required to complete the above form and return it either via fax or email to gina@kolfac.com. The first Field Visit Confirmation report is the first notice of items that need to be addressed in accordance with Kolache Factory Standards and Recommendations. All items are to be addressed and remedied before the next visit; if items are not, the next Field Visit Confirmation will be your second notice. Upon the third notice, a Certified Letter will be sent stating items were not addressed and the franchisee is now in default of their Franchisee Agreement. For questions or concerns please contact your supervisor. 8/18/09



























